**IN THE SUPREME COURT OF THE STATE OF NEW MEXICO**

**Opinion Number:  2012-NMSC-008**

**Filing Date: March 29, 2012**

**Docket No. 31,241**

**STATE OF NEW MEXICO,**

    **Plaintiff-Appellee,**

**v.**

**STEVE TOLLARDO,**

    **Defendant-Appellant.**

**APPEAL FROM THE DISTRICT COURT OF TAOS COUNTY**
**Eugenio S. Mathis, District Judge**

Jacqueline L. Cooper, Acting Chief Public Defender
William A. O'Connell, Assistant Appellate Defender
Santa Fe, NM

for Appellant

Gary K. King, Attorney General
Francine Ann Baca-Chavez, Assistant Attorney General
Santa Fe, NM

for Appellee

**OPINION**

**SERNA, Justice.**

**{1}**    Defendant Steve Tollardo was convicted by a jury of first-degree murder (accessory), kidnapping (accessory), conspiracy to commit murder, and conspiracy to commit kidnapping. He was acquitted of aggravated arson (accessory) and conspiracy to commit aggravated arson.  This Court has jurisdiction over Defendant's direct appeal pursuant to Article VI, Section 2 of the New Mexico Constitution and Rule 12-102(A)(1) NMRA.

**{2}**    We address only one of the issues Defendant raises on appeal:  whether the district

1

court erred in advising the jury that two other individuals were convicted of conspiracy to commit second-degree murder in connection with the same homicide underlying the charges against Defendant. We conclude that the district court did err in mentioning the co-conspirators' convictions, and that the error was not harmless. Accordingly, we reverse Defendant's convictions and remand to the district court for a new trial. In reaching this holding, we reexamine our harmless error analysis and clarify that a review of the particular circumstances in each case, rather than mechanical application of a multi-factor test, must guide the inquiry into whether a given trial error requires reversal.

## I. BACKGROUND

{3} This appeal arises out of the gruesome killing of Juan Alcantar (Victim) in Taos on September 6-7, 2003. The underlying facts of the crime are detailed in the Court's prior opinion in *State v. Gallegos*, 2011-NMSC-027, ¶¶ 5-14, 149 N.M. 704, 254 P.3d 655, which resolved an appeal filed by Lawrence Gallegos, one of Defendant's co-conspirators. Additional facts are set forth below to provide context for the resolution of the present appeal.

{4} Testimony at Defendant's trial established the following sequence of events. On the night of September 6, 2003, Defendant and Victim visited a sports bar in Taos, where they were denied entry. Ivan Romero, a friend of Defendant, exited the sports bar, approached Defendant and Victim in the bar's parking lot, and punched Victim. Defendant and Victim then left the parking lot together, and Ivan Romero left separately.

{5} Later that night, Defendant and Victim were "kicking back" at Richard Anaya's house with Anaya himself, Gallegos, Luis Trujillo, and Racquel Gonzales, later joined by Ivan Lujan. Apparently without warning, Trujillo and Gallegos began kicking and hitting Victim. Defendant and Trujillo then drove to the house of Elias Romero, the father of Ivan Romero. Elias Romero was in the house along with his girlfriend Michelle Martinez, who would be the State's main witness, and his nephew Jaime Romero. Defendant, who appeared "hyped up," told the occupants of the house about the altercation between Ivan Romero and Victim and added that Victim was tied up at Anaya's house. Defendant explained that after the incident at the sports bar he had gone to see Ivan Romero, who disliked Victim and suggested that Elias Romero "would know what to do" with Victim. Defendant also told Elias Romero that Victim had a gun and had threatened to kill Ivan Romero. Jaime Romero mentioned that he had "some soldiers" who could "take care of it." Defendant replied that it was not his "viaje," meaning not his problem. Elias Romero gave a syringe containing a lethal dose of heroin to Martinez and instructed her to "inject [Victim] and make it look like he overdosed."

{6} Martinez then traveled with Defendant and Trujillo to Anaya's house. When they arrived, Victim was lying on the kitchen floor with his hands tied and a black eye. Gallegos was standing over Victim with a kitchen knife. Martinez sat on Victim's hand and injected him with the lethal dose of heroin. Victim cried out to Defendant for help and said, "Steve,

2

please help me." Defendant told Victim that "he shouldn't have fucked with Diablo," a nickname for Ivan Romero.

**{7}** After Victim stopped moving and Martinez believed him to be dead, Defendant, Gallegos, and Trujillo moved Victim onto a tablecloth. The other individuals, Anaya, Lujan, and Gonzales, were elsewhere in the house during this time. When Victim was moved onto the tablecloth, he began moaning. Martinez was afraid that Victim might regain consciousness, so she instructed Defendant, Gallegos, and Trujillo to leave Victim alone. A short time later, Defendant and Gallegos carried Victim to Victim's car and placed him on the passenger's seat.

**{8}** Martinez testified that "the plan" laid out by Elias Romero was for her to drive Victim's car and leave Victim in a secluded place to make it appear as though Victim died of a drug overdose. Martinez drove Victim's car with Gallegos and Victim inside, attempting to follow Defendant and Trujillo who were driving in a separate car. Martinez was unable to follow Defendant and Trujillo, so she drove to a nearby church parking lot. Eventually, Defendant and Trujillo arrived at the parking lot, at which point Martinez and Gallegos got into the car with Defendant and Trujillo, leaving the unconscious Victim in his car.

**{9}** During the drive back to Elias Romero's house, Gallegos and Defendant discussed burning Victim's car to destroy Gallegos' fingerprints and other evidence that might show that Victim did not die of a drug overdose. At Elias Romero's house, Gallegos obtained lantern fuel and left with Defendant and Trujillo. Some time later, Defendant, Gallegos, and Trujillo returned once again to Elias Romero's house. Defendant told Martinez that he, Gallegos, and Trujillo used the lantern fuel and a cherry bomb to set fire to Victim's car with Victim inside.

**{10}** Seven individuals were prosecuted in connection with Victim's death: Defendant, Lawrence Gallegos, Luis Trujillo, Elias Romero, Michelle Martinez, Jaime Romero, and Ivan Romero. Gallegos was convicted by a jury of first-degree murder, aggravated arson, kidnapping, and three counts of conspiracy. *Id.* ¶ 2. Trujillo was convicted by a jury of first-degree murder, aggravated arson, conspiracy to commit first-degree murder, conspiracy to commit kidnapping, and conspiracy to commit aggravated arson. *Trujillo*, No. 31,500, slip op. at 2 (N.M. Sup. Ct. June 27, 2011). Elias Romero was acquitted of first-degree murder and conspiracy to commit first-degree murder. Martinez pleaded guilty to conspiracy to commit first-degree murder. Jaime Romero and Ivan Romero also resolved the charges against them through pleas, with the former apparently pleading guilty to conspiracy to commit second-degree murder, and the latter pleading no contest to the same charge.[1] This Opinion will refer to these latter two pleas as "the Romeros' pleas" or "the

---

[1] The record is not conclusive as to whether Jaime Romero and Ivan Romero entered pleas of guilty or no contest to conspiracy to commit second-degree murder, although the

3

Romeros' convictions."

**{11}** At Defendant's trial, defense counsel acknowledged during his opening statement that Defendant was present at the home of Richard Anaya on September 6-7, 2003, where Victim was forcibly held before being killed. Defense counsel asked the jury to "look closely" at Defendant's "real involvement" in Victim's death, explaining that "it's not enough that [Defendant] was there. . . . There has to be something more by the State to show that [Defendant] actually helped, encouraged or caused this crime to be committed." Amplifying this point, defense counsel stated that three other individuals who were also present at Anaya's home that night–Anaya himself, Racquel Gonzales, and Ivan Lujan–were not charged in connection with Victim's death. Defense counsel clarified that while Anaya was charged initially, the State dropped charges after further investigation.

**{12}** Later on in the trial, during direct examination of John Wentz, a detective with the Taos Police Department who investigated Victim's death, the prosecutor asked if Detective Wentz had personal knowledge as to whether Ivan Romero and Jaime Romero had been convicted in connection with Victim's death. Defense counsel objected that the question was irrelevant. Outside the presence of the jury, the State responded that the disposition of the charges against Ivan Romero and Jaime Romero was relevant because

> [w]ithout asking that question, we would be left with the jury wondering what happened, if Ivan and Jaime were ever convicted. . . .
>
> For the jury not to have any information as to the particular people who this detective's investigation revealed, their not having been charged and convicted would leave a hole in the evidence for the jury that we believe we could fill this way.

**{13}** The district court acknowledged that defense counsel's objection "[wa]s somewhat well taken in that this testimony [wa]s being offered to prove the truth of the matter asserted." Nevertheless, the district court decided that the fact that Ivan Romero and Jaime Romero were convicted through pleas in connection with Victim's death would be presented to the jury, and that the "best route" to doing so would be for the court to take judicial notice of the Romeros' pleas rather than allowing Detective Wentz to testify on that matter.

**{14}** After the State rested its case (the defense did not call any witnesses), and before closing arguments, the district court informed the jury that

---

district court and counsel consistently referred to Ivan Romero as having pleaded no contest to the charge.

4

there are certain facts that you must accept as true. You can give them whatever weight you want to give it [sic]. But there was a question asked of Detective Wentz while he was testifying as to whether or not certain people have been convicted. I am going to instruct you, without requiring testimony or otherwise, that the court has taken notice that Jaime and Ivan Romero were convicted of conspiracy to commit second degree murder. Ivan Romero was convicted pursuant to a no contest plea. A no contest plea means that a defendant does not admit or deny guilt, but will accept a conviction.

You may, but are not required to accept this as a fact. And you may give this evidence whatever weight you believe it deserves.

The jury convicted Defendant on the charges listed above, including first-degree murder. This appeal followed.

## II.   DISCUSSION

### A.   Admitting the Romeros' Convictions Violated Defendant's Sixth Amendment Right to Confrontation

**{15}**    Defendant argues that introducing the Romeros' convictions to the jury violated his right, under the Sixth Amendment to the United States Constitution, to confront the witnesses against him. Claimed violations of the Sixth Amendment right to confrontation are reviewed de novo. *State v. Cabezuela*, 2011-NMSC-041, ¶ 49, 150 N.M. 654, 265 P.3d 705. Under the Sixth Amendment, every criminal defendant "shall enjoy the right . . . to be confronted with the witnesses against him." U.S. Const. amend. VI. "[T]his bedrock procedural guarantee applies to both federal and state prosecutions." *Crawford v. Washington*, 541 U.S. 36, 42 (2004). The Confrontation Clause "applies to witnesses against the accused–in other words, those who bear testimony. Testimony, in turn, is typically [a] solemn declaration or affirmation made for the purpose of establishing or proving some fact." *Id.* at 51 (internal quotation marks and citation omitted).

**{16}**    The United States Supreme Court, however, to date has avoided establishing a firm definition of what constitutes a "testimonial statement." *Id.* Instead, the Supreme Court has identified a "core class" of testimonial statements:

[*E*]*x parte* in-court testimony or its functional equivalent–that is, material such as affidavits, custodial examinations, prior testimony that the defendant was unable to cross-examine, or similar pretrial statements that declarants would reasonably expect to be used prosecutorially, extrajudicial statements . . . contained in formalized testimonial materials, such as affidavits, depositions, prior testimony, or confessions, statements that were made under circumstances which would lead an objective witness reasonably to believe that the statement would be available for use at a later trial.

5

*Id.* at 51-52 (internal quotation marks and citations omitted). These formulations "all share a common nucleus." *Id.* at 52. "[A]t a minimum," the Supreme Court explained, the term "testimonial" covers "testimony at a preliminary hearing, before a grand jury, or at a formal trial." *Id.* at 68. Considering the types of statements deemed to be testimonial by the United States Supreme Court, this Court recently noted that "[w]hat these examples have in common is that they lend themselves to an analysis that focuses largely on surrounding circumstances to separate testimonial from non-testimonial statements." *State v. Mendez*, 2010-NMSC-044, ¶ 29, 148 N.M. 761, 242 P.3d 328. We therefore look at the circumstances surrounding how pleas of guilty and no contest are entered in New Mexico to determine whether such pleas are testimonial or non-testimonial statements.

**{17}** Before a court accepts a defendant's plea of guilty or no contest, the court must first personally address the defendant in open court, "informing the defendant of and determining that the defendant understands" certain rights and consequences surrounding the plea offer. Rule 5-303(F) NMRA. Once the court has so informed the defendant and determined that the defendant understands those rights and consequences, the court must then determine that the defendant is entering a plea of guilty or no contest voluntarily. Rule 5-303(G); *see also State v. Garcia*, 1996-NMSC-013, 121 N.M. 544, 546-47, 915 P.2d 300, 302-03 (describing the procedures New Mexico courts follow to ensure that a defendant's guilty plea is knowing and voluntary).

**{18}** The procedures a court must follow in accepting a defendant's plea ensure that the defendant knows and understands the gravity of the statement he or she is about to make, and that the defendant is making the statement voluntarily, to a judge in open court, with a full understanding of his or her rights and the consequences of making such a statement. Under these circumstances, a plea is more akin to "a formal statement to government officers" than "a casual remark." *Crawford*, 541 U.S. at 51. It is reasonable to conclude that such a knowing and voluntary statement "would lead an objective witness reasonably to believe that the statement would be available for use at a later trial." *Id.* at 52. We hold, therefore, that a plea of guilty or no contest constitutes a "testimonial statement" under *Crawford*. *See United States v. McClain*, 377 F.3d 219, 221 (2d Cir. 2004) ("[I]t is clear that a plea allocution constitutes testimony, as it is formally given in court, under oath, and in response to questions by the court or the prosecutor."); *State v. Fields*, 168 P.3d 955, 965 (Haw. 2007) (listing "plea allocutions" as "undeniably testimonial under the sixth amendment"); *People v. Duff*, 872 N.E.2d 46, 50 (Ill. App. Ct. 2007) (concluding that a co-defendant's guilty plea is "testimonial" under *Crawford*); *see also United States v. Massino*, 319 F. Supp. 2d 295, 298 (E.D.N.Y. 2004); *Morten v. State*, 856 A.2d 595, 600 (D.C. 2004). As a testimonial statement, a co-defendant's plea of guilty or no contest is inadmissible against a defendant to prove the truth of the matter asserted unless the demands of the Confrontation Clause have been met, in other words that the defendant has an opportunity to cross-examine the co-defendant concerning the plea agreement. *See Crawford*, 541 U.S. at 53-54 (holding that a prior opportunity to cross-examine the witness satisfies the Confrontation Clause).

6

**{19}** In *Kirby v. United States*, the United States Supreme Court held that it was a violation of the Confrontation Clause to admit the convictions of co-defendants to prove a "vital fact involved in the charge against" a defendant. 174 U.S. 47, 61 (1899). This Court adopted that holding in *State v. Martino*, ruling that the guilty plea of a gambler could not be admitted against the defendant, who was standing trial for permitting the gambling to take place on his premises. 25 N.M. 47, 47, 176 P. 815, 815-16 (1918) (citing *Kirby*, 174 U.S. 47). We reiterated this principle in *State v. Jackson*, where we reversed a defendant's convictions and noted that a co-defendant's guilty plea was "particularly not admissible as to elements of the offense as against a person not a party to the proceeding." 47 N.M. 415, 415, 143 P.2d 875, 877 (1943). Similarly, in *State v. Urioste*, the Court of Appeals addressed a situation where a defendant was charged with conspiracy to commit murder. 94 N.M. 767, 768, 617 P.2d 156, 157 (Ct. App. 1980). The theory of the State's case was that the defendant conspired with another person to kill the victim. *Id.* The State asked the court to take judicial notice that the co-defendant pleaded guilty to conspiracy to commit murder, arguing that the conviction was relevant "to prove that this man was part of the conspiracy, admitted that he was, in fact, a member of that conspiracy, and that he did, in fact, conspire with [the defendant]." *Id.* at 768-69, 617 P.2d at 157-58 (internal quotation marks omitted). The Court of Appeals held that it was error to admit the co-defendant's convictions "[b]ecause it deprived [the defendant] of the right to confront witnesses against her." *Id.* at 769, 617 P.2d at 158; *see also Bisaccia v. Att'y Gen. of the State of N.J.*, 623 F.2d 307, 314 (3d Cir. 1980) (Seitz, J., concurring) (reasoning that admitting the guilty plea of another person violated the defendant's confrontation rights, not with respect to the person who tendered the plea but with respect to "the witnesses that the government would have presented in a trial of the third person").

**{20}** Defendant argues that the conviction of a co-defendant is entirely inadmissible at trial. A co-defendant's conviction, however, may be admissible when it is introduced to impeach that co-defendant if he or she testifies, rather than as substantive evidence of the defendant's guilt. *See State v. Gilbert*, 98 N.M. 77, 83, 644 P.2d 1066, 1072-73 (Ct. App. 1982) (distinguishing *Jackson* and *Urioste* and allowing the admission of the co-defendants' convictions because "the purpose of questioning [the co-defendants] regarding their guilty pleas clearly was not solely to prove existence of a conspiracy in which [the] defendant participated," but was also used to attack the credibility of those co-defendants); *see also United States v. Baez*, 703 F.2d 453, 455 (10th Cir. 1983) ("[E]ither the government or the defense may elicit evidence of a guilty plea for the jury to consider in assessing the codefendant's credibility as a witness.").

**{21}** Indeed, here defense counsel elicited testimony from Martinez about her guilty plea in connection with Victim's death in an effort to impeach her credibility. In contrast to Martinez, neither Jaime Romero nor Ivan Romero testified at Defendant's trial, and thus their credibility was never at issue. Their convictions, therefore, could not be admissible for impeachment purposes under the above rationale.

**{22}** We reject the State's claim that the otherwise inadmissible convictions were properly

placed before the jury to remedy the assertedly "unfair" reference by defense counsel to the fact that other named individuals (Anaya, Gonzales, and Lujan) had not been charged in connection with Victim's death. When a defendant makes a claim that "opens the door" to inadmissible evidence, the doctrine of curative admissibility in some circumstances may permit the State to rebut that claim with otherwise inadmissible evidence. *See State v. Ruiz*, 2001-NMCA-097, ¶ 47, 131 N.M. 241, 34 P.3d 630 (citing *State v. Baca*, 120 N.M. 383, 390 n.2, 902 P.2d 65, 72 n.2 (1995)). The State, however, does not explain the supposed equivalence between the convictions of the Romeros (who *were not* present at Anaya's house where Victim was held against his will prior to being killed), and defense counsel's statement that no charges were filed against Anaya, Gonzales, and Lujan (who *were* present at Anaya's house).[2] Furthermore, the prosecutor sought testimony about and the district court took judicial notice of the Romeros' convictions, not just the charges filed against them. We need not decide here whether the doctrine of curative admissibility may be used to admit testimonial statements in violation of the Confrontation Clause, because curative admissibility is inapplicable to this case.

**{23}** The district court's effective admission of the Romeros' testimonial plea agreements, therefore, violated Defendant's Sixth Amendment right to confront the witnesses against him. *See, e.g.*, *State v. Lopez*, 2007-NMSC-037, ¶ 21, 142 N.M. 138, 164 P.3d 19 (finding a "per se" Sixth Amendment violation in admitting testimonial statements of co-defendants who did not testify at the defendant's trial where the defendant did not have an opportunity to cross-examine the co-defendants).

**{24}** Although not necessary for the resolution of this appeal, we note that the introduction of the Romeros' convictions also presents a serious due process problem. Every criminal defendant has a right "to have his guilt or innocence determined by the evidence presented against him, not by what has happened with regard to a criminal prosecution against someone else." *United States v. Toner*, 173 F.2d 140, 142 (3d Cir. 1949); *see also Bisaccia*, 623 F.2d at 312-13 (relying in part on *Toner*, holding that admission of a co-conspirator's guilty plea violated the defendant's due process rights, and remanding to the district court for harmless error review). Just as it would be improper to allow the introduction of a co-conspirator's acquittal to show that the defendant himself should be acquitted, it would be similarly improper to admit evidence of a non-testifying co-conspirator's conviction to

---

[2] The prosecutor obtained testimony that easily could have been used to dispel any concern that the jury would be confused about the role of different individuals in the events leading up to Victim's death. For instance, Detective Wentz testifiedthat in his interview with Martinez, she implicated some individuals as being involved in Victim's death and others as merely being present at Anaya's house. Martinez herself testified on direct examination that she never saw Anaya, Gonzales, or Lujan "do anything" to Victim. And Detective Wentz testified that another individual, Elias Romero, was charged in connection with Victim's death.

establish that the defendant himself is guilty. *See United States v. Sanders*, 95 F.3d 449, 454 (6th Cir. 1996) ("[U]nder a parallel treatment for guilty pleas and acquittals, [a co-conspirator's] acquittal may not be admitted" (citing *United States v. Fernandez-Roque*, 703 F.2d 808, 813 (5th Cir. 1983))). Here, even though the district court recognized the danger in allowing testimony about Ivan and Jaime Romero's involvement in Victim's murder, it nonetheless informed the jury about the Romeros' convictions. By instructing the jury that the convictions were facts that it "must accept as true," the district court created the risk that Defendant's guilt or innocence would in some part be determined by "what . . . happened with regard to a criminal prosecution against someone else." *Toner*, 173 F.2d at 142.

## B.       Applicable Standard for Harmless Error Review

**{25}**    Improperly admitted evidence is not grounds for a new trial unless the error is determined to be harmful. *State v. Macias*, 2009-NMSC-028, ¶ 37, 146 N.M. 378, 210 P.3d 804; *State v. Barr*, 2009-NMSC-024, ¶ 47, 146 N.M. 301, 210 P.3d 198. A "very limited class of errors," not at issue here, is deemed structural and is not reviewed for harmless error but instead "require automatic reversal." *State v. Alvarez-Lopez*, 2004-NMSC-030, ¶ 51, 136 N.M. 309, 98 P.3d 699. Where, as here, a constitutional error has been established, the State bears the burden of proving that the error is harmless. *See, e.g.*, *State v. Gutierrez*, 2007-NMSC-033, ¶ 18, 142 N.M. 1, 162 P.3d 156 ("The State has the burden of establishing that [a] constitutional error was harmless beyond a reasonable doubt." (internal quotation marks and citation omitted)).

**{26}**    The concept of harmless error arose "as a reaction to an era marked by automatic reversal of cases for any procedural error." *Barr*, 2009-NMSC-024, ¶ 47 (citing 7 Wayne R. LaFave et al., *Criminal Procedure* § 27.6(a), at 99-100 (3d ed. 2007)). The harmless error rule originally developed outside the context of constitutional review, simply to "require appellate courts to affirm lower courts notwithstanding technical errors, defects, or exceptions which did not affect the substantial rights of the parties." *Barr*, 2009-NMSC-024, ¶ 48 (quoting 7 LaFave, *supra*, § 27.6(a) at 101 internal quotation marks and brackets omitted)).

**{27}**    Although not always employing the term "harmless error," New Mexico courts historically evaluated claims of error by inquiring into how severely the defendant was affected thereby. In *State v. Coyle*, for example, this Court considered whether or not a trial error worked a "prejudice" against the defendant, concluding that the error was harmless because "[n]one of the evidence here in question could have influenced the jury." 39 N.M. 151, 155, 42 P.2d 770, 772 (1935); *see also State v. Pruett*, 22 N.M. 223, 235, 160 P. 362, 366 (1916) (A trial error was not harmless because improperly admitted testimony was "highly prejudicial" to the defendant.); *State v. Varos*, 69 N.M. 19, 23, 363 P.2d 629, 631 (1961) (improperly admitted testimony about a lie-detector test was reversible error because its "net effect . . . was to cast doubt upon the truth and veracity of the defendant in a manner not countenanced by the courts," thereby "taint[ing]" the jury's verdict.); *State v. Rowell*, 77 N.M. 124, 128, 419 P.2d 966, 969 (1966) (The prosecution's inquiry into the defendant's

9

prior conviction "was fraught with such harm to defendant as to be irremediable." (internal quotation marks and citation omitted)).

**{28}** In the 1960s, "with the unprecedented expansion of federal constitutional protections into the criminal process, harmless error analysis was imported into the constitutional context." *Barr*, 2009-NMSC-024, ¶ 49 (citing 7 LaFave, *supra*, § 27.6(a) at 101). In *Fahy v. Connecticut*, the United States Supreme Court held that the erroneous admission of unconstitutionally obtained evidence required reversal, noting that the Supreme Court was "not concerned . . . with whether there was sufficient evidence on which the [defendant] could have been convicted" absent the erroneously admitted evidence, but rather whether there was a "reasonable possibility that the evidence complained of might have contributed to the conviction." 375 U.S. 85, 86-87 (1963). The Supreme Court refined this principle in *Chapman v. California*, holding that "before a federal constitutional error can be held harmless, the court must be able to declare a belief that it was harmless beyond a reasonable doubt," 386 U.S. 18, 24 (1967), which tracked the prosecution's burden of proof for establishing guilt in the first instance. The Supreme Court made clear that constitutional errors meeting this standard would be found "so unimportant and insignificant that they may, consistent with the Federal Constitution, be deemed harmless, not requiring the automatic reversal of the conviction." *Id.* at 18, 22. Within a few years, appellate courts in New Mexico were applying this emerging federal constitutional standard to their harmless error review.[3] *See, e.g.*, *State v. Jones*, 80 N.M. 753, 753-54, 461 P.2d 235, 235-36 (Ct. App. 1969) (State failed to show beyond a reasonable doubt that a prosecutor's comment to the jury about the defendants' failure to testify was harmless.); *State v. Spearman*, 84 N.M. 366, 369, 503 P.2d 649, 652 (Ct. App. 1972) (State did not meet its burden to show beyond a reasonable doubt that the trial court's failure to give a jury instruction was harmless.).

**{29}** In 1980, this Court departed significantly from the harmless error standard developed in *Fahy* and *Chapman*, and announced a new three-part test for reviewing courts to apply in their harmless error analysis:

> For an error by the trial court to be considered as harmless, there must be: (1) substantial evidence to support the conviction without reference to the improperly admitted evidence, (2) such a disproportionate volume of permissible evidence that, in comparison, the amount of improper evidence will appear so minuscule that it could not have contributed to the conviction, and (3) no substantial conflicting evidence to discredit the State's testimony.

---

[3] Our Rules of Criminal Procedure also explicitly recognize the concept of harmless error and instruct courts that trial errors are not grounds for "granting a new trial or for setting aside a verdict, for vacating, modifying or otherwise disturbing a judgment or order, unless refusal to take any such action appears to the court inconsistent with substantial justice." Rule 5-113(A) NMRA; Rule 6-704(A) NMRA; Rule 7-704(A) NMRA; Rule 8-704(A) NMRA.

*State v. Moore*, 94 N.M. 503, 504, 612 P. 2d 1314, 1315 (1980).

**{30}** In *Moore*, the defendant was convicted of criminal sexual penetration, among other crimes. *Id.* He appealed his convictions to the Court of Appeals on the ground that the trial court erred in permitting the prosecution to admit testimony of the victim concerning her mental state following the rape. *Id.* "The Court of Appeals reversed on the basis of possible prejudice from the admission into evidence of improper testimony." *Id.* On review, this Court agreed with the Court of Appeals' conclusion that the victim's testimony was improperly admitted. *Id.* The Court went on, however, to apply the three-part test quoted above to conclude that the erroneous admission of the victim's testimony was harmless. *Id.*

**{31}** *Moore* announced the three-part test without analysis or persuasive precedent. The two cases cited in support, *State v. Day*, 91 N.M. 570, 577 P.2d 878 (Ct. App. 1978), and *State v. Self*, 88 N.M. 37, 536 P.2d 1093 (Ct. App. 1975), neither adopted the three-part test nor provided a logical foundation for its use. Rather, *Day* held that an error is only harmless if the reviewing court concludes "that the evidence of guilt was so overwhelming that there is no reasonable probability that the misconduct contributed to the conviction." 91 N.M. at 573-74, 577 P.2d 878, 881-82.[4] *Self* cited two prior Court of Appeals opinions, neither of which anticipates the three-part test created by *Moore*. One of those opinions, *State v. Thurman*, explained that an error would be treated as harmless if there was "no reasonable possibility that evidence improperly admitted, and then stricken by the trial court, contributed to the conviction." 84 N.M. 5, 9, 498 P.2d 697, 701 (Ct. App. 1972) (citing *Schneble v. Florida*, 405 U.S. 427 (1972)). The other opinion, *State v. Lopez,* determined that a trial error was harmless because "'[t]he evidence, exclusive of the improperly admitted exhibits, points so overwhelmingly[5] to the guilt of defendant of the crime of which he was convicted, that there is no reasonable possibility that the admission into evidence of these improperly received exhibits contributed to his conviction.'" 80 N.M. 599, 458 P.2d 851 (Ct. App. 1969) (quoting *State v. Gray*, 79 N.M. 424, 428, 444 P.2d 609, 613 (Ct. App. 1968)), *abrogated on other grounds by State v. Holly*, 2009-NMSC-004, 145 N.M. 513, 201 P.3d 844.

---

[4] This holding echoed the standard set forth in *Fahy*, 375 U.S. at 86-87, although modified from "reasonable possibility" to "reasonable probability" for reasons the Court of Appeals did not articulate, but perhaps owing to the non-constitutional nature of the error at issue. *See Barr*, 2009-NMSC-024, ¶ 53.

[5] The United States Supreme Court's decision in *Schneble* is the source of the principle that "overwhelming" evidence of guilt may help establish harmless error, although *Schneble* retained *Chapman's* requirement that harmlessness be "clear beyond a reasonable doubt." 405 U.S. at 430. *Chapman* itself expressed hesitation at the "emphasis, and perhaps overemphasis" of "overwhelming evidence" in harmless error review. 386 U.S. at 23.

11

**{32}** These opinions from the dozen or so years preceding *Moore* all provide slightly different phrasings of the same concept–that a trial error should be held harmless if there is "no reasonable possibility" (if the claimed error is constitutional in nature) or "no reasonable probability" (if the claimed error is evidentiary or procedural but does not implicate the defendant's constitutional rights) that the error contributed to the defendant's conviction, which might be determined in part by the overall strength of the evidence that the State marshaled against the defendant.

**{33}** No opinion of this Court prior to *Moore*, including the cases *Moore* relied upon that are discussed above, employed a three-part test for evaluating harmless error, and none appears to have made any reference to the third *Moore* factor–the presence or absence of "substantial conflicting evidence" from the defendant. 94 N.M. at 505, 612 P.2d at 1316. *Moore*, then, shifted the harmless error inquiry away from an assessment of an error's impact on the verdict, and toward a more mechanical approach that requires appellate courts to weigh an error against properly admitted evidence in favor of conviction as well as any contrary evidence discrediting the prosecution's case. *Id.*

**{34}** In addition to lacking a reasoned foundation in New Mexico law for its existence, the *Moore* test has never been fully adopted by this Court, casting further doubt on its legitimacy and utility. While numerous cases have relied on *Moore*, many other opinions have avoided discussion of the three-part test altogether and instead followed the well-established principle of federal harmless error review that whether a given error requires reversal depends upon the "reasonable possibility" or "reasonable probability" that the error contributed to the conviction. *See, e.g.*, *State v. Gonzales*, 2000-NMSC-028, ¶ 42, 129 N.M. 556, 11 P.3d 131 (applying the "reasonable probability" standard to a non-constitutional error); *Alvarez-Lopez*, 2004-NMSC-030, ¶ 25 (applying the "reasonable possibility" standard to a constitutional error); *State v. Zamarripa*, 2009-NMSC-001, ¶ 52, 145 N.M. 402, 199 P.3d 846 (applying both the "reasonable possibility" standard and the requirement that the error be proven harmless beyond a "reasonable doubt"). Other opinions, without specifically invoking the "reasonable possibility" or "reasonable probability" standard, have remained focused on the likelihood that the error contributed to the underlying verdict. *See, e.g.*, *State v. Paiz*, 2011-NMSC-008, ¶ 19, 149 N.M. 412, 249 P.3d 1235 (analyzing whether error in misjoinder resulted in "prejudice" through a "substantial and injurious effect or influence" on the verdict (internal quotation marks and citation omitted)); *Fuson v. State*, 105 N.M. 632, 634, 735 P.2d 1138, 1140 (1987) (determining that impairment of a petitioner's right to a peremptory challenge "prejudice[d]" the petitioner, requiring a new trial).

**{35}** The present appeal is not this Court's first effort to address *Moore's* divergence from established standards of harmless error review. In *Barr*, we examined how New Mexico courts had up to that point applied the *Moore* test, noting that the test had in some cases replaced the "reasonable possibility" (or "reasonable probability") standard in determining whether an error is harmless. *Barr*, 2009-NMSC-024, ¶ 52; *see also State v. Williams*, 117 N.M. 551, 562, 874 P.2d 12, 23 (1994) (Montgomery, C.J., specially concurring) (suggesting

12

that *Moore* provides a measure of "harmless error" that is different from the "reasonable possibility" standard).

**{36}** In *Barr*, the defendant was tried for the murder of a former roommate. Another former roommate testified on behalf of the State, and defense counsel attempted to impeach that witness by citing inconsistencies between his in-court testimony and a videotaped statement that he had made to police. 2009-NMSC-024, ¶ 17. The State then introduced, and the district court admitted, the videotaped statement, in which the witness detailed the defendant's killing of the victim and reflected on the defendant's bad character. *Id.* ¶¶ 13-16. After being convicted, the defendant appealed on the basis that the admission of the videotaped statement was improper. *Id.* ¶ 22. The State responded that even if the admission of the statement was error, that error was harmless. *Id.* ¶ 46. We agreed that the error was harmless, and went on to clarify the standard that appellate courts must apply in making such determinations. We "re-fortif[ied] the boundary between non-constitutional and constitutional error for the purpose of harmless error analysis," *id.* ¶ 53, explaining that "it is appropriate to review non-constitutional error with a lower standard than that reserved for our most closely held rights," *id.* ¶ 51, and therefore reviewing courts "should only conclude that [a constitutional] error is harmless when there is no reasonable *possibility* it affected the verdict." *Id.* ¶ 53. By comparison, a non-constitutional error is harmless "when there is no reasonable *probability* the error affected the verdict." *Id.* ¶ 53. Recognizing the federal constitutional underpinnings for such a distinction, *id.* ¶¶ 49-51, we observed that "the reasonable possibility standard continues to resemble the reasonable doubt standard while the reasonable probability standard requires a greater degree of likelihood that a particular error affected a verdict." *Id.* ¶ 54. We reaffirm that holding here.

**{37}** *Barr* then discussed the "long-standing three-part test" from *Moore*, which we noted "makes no mention of the 'reasonable possibility' standard." *Barr*, 2009-NMSC-024, ¶ 52. We proceeded to sanction the three *Moore* factors, not as a mandatory test as they had been utilized to date, but rather as a "useful framework" which would "provide . . . a reliable basis for determining whether an error is harmless." *Id.* ¶ 55. Since *Barr*, however, courts have continued to employ the *Moore* factors as an inflexible test when assessing the harmfulness of erroneously admitted evidence. *See, e.g.*, *State v. Wilson*, 2011-NMSC-001, ¶¶ 40-42, 149 N.M. 273, 248 P.3d 315; *State v. Tom*, 2010-NMCA-062, ¶ 20, 148 N.M. 348, 236 P.3d 660. Because this Court has a responsibility to "correct a judicial misinterpretation of our caselaw that may otherwise remain on the books as an erroneous precedent," *Rivera v. Am. Gen. Fin. Servs., Inc.*, 2011-NMSC-033, ¶ 41, 150 N.M. 398, 259 P.3d 803, we overrule *Moore* to the extent that it mandated the three-part test as the proper analytical framework for reviewing harmless error. For the reasons discussed below, we also overrule that portion of *Barr* that recognized the legitimacy of *Moore*, even when its factors are used more flexibly, as well as all other cases to the extent that they applied *Moore* to resolve a claim

13

of harmless error.[6]

**{38}**    In sum, we no longer recognize the *Moore* three-part test or any of the factors thereof as accurate statements of law. To explain our renunciation of *Moore*, we examine the factors individually, beginning with the first factor: whether there is "substantial evidence to support the conviction without reference to the improperly admitted evidence." *Barr*, 2009-NMSC-024, ¶ 56. This factor, through its use of the phrase "substantial evidence," runs the risk of allowing the more deferential "sufficiency of the evidence" standard of appellate review to seep into a court's harmless error analysis. *See, e.g.*, *State v. Aragon*, 2010-NMSC-008, ¶ 36, 147 N.M. 474, 225 P.3d 1280 (focusing on the sufficiency of the evidence that supports a conviction to conclude an error was harmless); *Tom*, 2010-NMCA-062, ¶ 19 (relying on the "sufficiency of the evidence" standard when applying the first *Moore* factor).

**{39}**    Where a defendant appeals from a conviction on the ground that it was not supported by sufficient evidence, the appellate court must determine "whether, after reviewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact could have

---

[6] Our review has located the following cases where our appellate courts analyzed harmless error under the *Moore* test. Any other opinions that similarly applied the *Moore* test are also overruled to the extent they did the same: *State v. Wilson*, 2011-NMSC-001, ¶¶ 39-42, 149 N.M. 273, 248 P.3d 315; *State v. Branch*, 2010-NMSC-042, ¶¶ 15-17, 148 N.M. 601, 241 P.3d 602; *State v. Aragon*, 2010-NMSC-008, ¶¶ 35-36, 147 N.M. 474, 225 P.3d 1280; *State v. Marquez*, 2009-NMSC- 055, ¶¶ 21-25, 147 N.M. 386, 223 P.3d 931; *State v. Macias*, 2009-NMSC-028, ¶¶ 39-44, 146 N.M. 378, 210 P.3d 804; *State v. McClaugherty*, 2003-NMSC-006, ¶¶ 32-34, 133 N.M. 459, 64 P.3d 486; *State v. Gonzales*, 2000-NMSC-028, ¶ 42, 129 N.M. 556, 11 P.3d 131; *State v. Duffy*, 1998-NMSC-014, ¶¶ 38-41, 126 N.M. 132, 967 P.2d 807; *State v. Ross*, 1996-NMSC-031, 122 N.M. 15, 27, 919 P.2d 1080, 1092; *State v. Williams*, 117 N.M. 551, 559, 874 P.2d 12, 20 (1994); *State v. Compton*, 104 N.M. 683, 687, 726 P.2d 837, 841 (1986); *Sanchez v. State*, 103 N.M. 25, 27-28, 702 P.2d 345, 347-48 (1985); *State v. Skinner*, 2011-NMCA-070, ¶¶ 22-26, 150 N.M. 26, 256 P.3d 969; *State v. Tom*, 2010-NMCA-062, ¶¶ 17-20, 148 N.M. 348, 236 P.3d 660; *State v. McClennen*, 2008-NMCA-130, ¶¶ 13-15, 144 N.M. 878, 192 P.3d 1255; *State v. Morales*, 2002-NMCA-052, ¶¶ 24-25, 132 N.M. 146, 45 P.3d 406; *State v. Barragan*, 2001-NMCA-086, ¶¶ 19-20, 131 N.M. 281, 34 P.3d 1157; *State v. Glasgow*, 2000-NMCA-076, ¶ 20, 129 N.M. 480, 10 P.3d 159; *State v. Gutierrez*,1998-NMCA-172, ¶¶ 11, 13-14, 126 N.M. 366, 969 P.2d 970; *State v. Elinski*, 1997-NMCA-117, ¶¶ 25-27, 124 N.M. 261, 948 P.2d 1209; *State v. Tave*, 1996-NMCA-056, ¶¶ 17-18, 122 N.M. 29, 919 P.2d 1094; *State v. Aragon*, 116 N.M. 291, 295-96, 861 P.2d 972, 976-77 (Ct. App. 1993); *State v. Sansom*, 112 N.M. 679, 683, 818 P.2d 880, 884 (Ct. App. 1991); *State v. Pacheco*, 110 N.M. 599, 603, 798 P.2d 200, 204 (Ct. App. 1990); *State v. Lara*, 109 N.M. 294, 298, 784 P.2d 1037, 1041 (Ct. App. 1989); *State v. Roybal*, 107 N.M. 309, 312-13, 756 P.2d 1204, 1207-08 (Ct. App. 1988); *State v. Gonzales*, 105 N.M. 238, 242, 731 P.2d 381, 385 (Ct. App. 1986); *State v. Dobbs*, 100 N.M. 60, 68, 665 P.2d 1151, 1159 (Ct. App. 1983).

14

found the essential elements of the crime beyond a reasonable doubt." *Alvarez-Lopez*, 2004-NMSC-030, ¶ 30 (internal quotation marks and citation omitted). In conducting such a review, the court "indulg[es] all reasonable inferences and resolv[es] all conflicts in the evidence in favor of the verdict." *State v. Duran*, 2006-NMSC-035, ¶ 5, 140 N.M. 94, 140 P.3d 515 (internal quotation marks and citation omitted). By contrast, "[t]he jury verdict should not automatically be afforded deference when a constitutional error has infected the trial," and so in harmless error review the verdict is entitled to deference "*only* when the State has established beyond a reasonable doubt that the jury verdict was not tainted by the constitutional error." *Alvarez-Lopez*, 2004-NMSC-030, ¶ 30.

**{40}** The second *Moore* factor directs courts to consider whether the prosecution presented "such a disproportionate volume of permissible evidence that, in comparison, the amount of improper evidence will appear so minuscule that it could not have contributed to the conviction." *Barr*, 2009-NMSC-024, ¶ 52 (quoting *Moore*, 94 N.M. at 504, 612 P.2d at 1315). The first two factors are closely linked and invite the same type of potential misuse: that an error may be deemed harmless simply because of the sheer volume of other evidence supporting conviction. There are "some circumstances where . . . the evidence of a defendant's guilt is sufficient even in the absence of the trial court's error," that still require the reviewing court "to reverse the conviction if the jury's verdict appears to have been tainted by error." *Macias*, 2009-NMSC-028, ¶ 38; *see also State v. Johnson*, 2004-NMSC-029, ¶ 11, 136 N.M. 348, 98 P.3d 998 ("[C]onstitutional error must not be deemed harmless solely based on overwhelming evidence of the defendant's guilt."). There are several reasons why it is improper for "overwhelming evidence" of a defendant's guilt to serve as the main determinant of whether an error was harmless. First, such an approach moves the inquiry away from its appropriate "central focus," which is "whether there is a reasonable possibility" or probability, depending on whether the error offends the defendant's constitutional rights, that "the erroneous evidence might have affected the jury's verdict." *Id.* In addition, excessive reliance on "overwhelming evidence" of guilt also ignores the principle that "even if conviction *appears* inevitable, there is a point at which an error becomes too great to condone as a matter of constitutional integrity and prosecutorial deterrence." *Alvarez-Lopez*, 2004-NMSC-030, ¶ 31 (internal quotation marks and citation omitted); *see also Moore*, 94 N.M. at 505, 612 P.2d at 1316 (Sosa, C.J., dissenting) ("Though evidence of guilt was great in this case, I believe that prosecutors should nonetheless conform to legal standards in obtaining convictions. . . . Convictions should not be obtained at any cost, but should be obtained in accordance with the rules of evidence."). In addition, when an appellate court gives too much consideration to "overwhelming evidence," it risks simply weighing the evidence in favor of and against guilt, which "would usurp the role of the jury." *State v. Stephen F.*, 2008-NMSC-037, ¶ 41, 144 N.M. 360, 188 P.3d 84; *see also Macias*, 2009-NMSC-028, ¶ 38 ("[I]t is not the role of the appellate court to re-weigh the evidence to decide a defendant's guilt or innocence.").

**{41}** The third *Moore* factor queries whether there is "substantial conflicting evidence to discredit the State's testimony." *Barr*, 2009-NMSC-024, ¶ 56. In addition to the same

15

potential for confusion posed by the term "substantial" evidence, discussed above, the third factor runs the risk of inappropriately shifting the burden of proof from the state to the defendant. *See, e.g.*, *State v. Ross*, 122 N.M. 15, 27, 919 P.2d 1080, 1092 (1996) (holding error to be harmless in part because defendant "failed to offer substantial conflicting evidence to discredit the State's testimony" (internal quotation marks and citation omitted)); *State v. McClennen*, 2008-NMCA-130, ¶ 15, 144 N.M. 878, 192 P.3d 1255 (holding error to be harmless in part because the defendant did not testify and "[t]hus, there is not substantial evidence in the record to discredit the State's evidence"). The burden of proof in the underlying criminal proceeding will always rest with the State. *See* UJI 14-5060 NMRA ("The burden is always on the state to prove guilt beyond a reasonable doubt."); *see also Moeller v. Weber*, 689 N.W.2d 1, 16 (S.D. 2004) (the defense "cannot be required to present any evidence whatever."). Similarly, once a constitutional error has been established it is the State's burden to demonstrate that the error is harmless. *See Gutierrez*, 2007-NMSC-033, ¶ 18. Because the third *Moore* factor appears to reduce that burden, it cannot be a proper component of our harmless error analysis. 94 N.M. at 504, 612 P.2d at 1315.

**{42}** Considering the *Moore* test as a whole, perhaps most significant and most problematic is what it omits: the central inquiry of whether an error was likely to have affected the jury's verdict. By limiting their harmless error review to the weight or volume of evidence in favor of guilt, courts avoid inquiring into the nature and likely impact of the very error at issue. *See United States v. Coughlin*, 821 F. Supp. 2d 8, 2011 WL 5301602 at *5 (D.D.C. 2011) ("The inquiry is 'whether the error itself had substantial influence." (quoting *Kotteakos v. United States*, 328 U.S. 750, 765 (1946))). In sum, even if applied more flexibly as a "useful framework" rather than as a rigid test, *Barr*, 2009-NMSC-024, ¶ 55, the *Moore* factors misstate the law and distort the proper focus of harmless error review from "whether the verdict was impacted by the error" to "whether, in spite of the error, the right result was reached." *Barr*, 2009-NMSC-024, ¶ 57.

**{43}** We now turn to what relevant considerations reviewing courts may use in place of the *Moore* factors when assessing the reasonable possibility (or reasonable probability) that impermissible evidence contributed to a defendant's conviction. To be sure, there are "no scientific answers to the ultimate question of whether the trier of fact was influenced by an error," as the reviewing court cannot conclusively determine "what went on in the mind of another or of twelve others." Roger J. Traynor, *The Riddle of Harmless Error* 23 (Ohio State Univ. Press 1970). But in reaching a judgment as to the likely effect of the error, courts should evaluate all of the circumstances surrounding the error. This requires an examination of the error itself, which depending upon the facts of the particular case could include an examination of the source of the error and the emphasis placed upon the error. Of course, evidence of a defendant's guilt separate from the error may often be relevant, even necessary, for a court to consider, since it will provide context for understanding how the error arose and what role it may have played in the trial proceedings; but such evidence, as discussed above, can never be the singular focus of the harmless error analysis as it was under *Moore*. As we have previously explained, when reviewing an error's role in the trial,

courts may, depending upon the circumstances of the cases before them, examine "the importance of the [erroneously admitted evidence] in the prosecution's case," as well as "whether the [error] was cumulative" or instead introduced new facts. *Johnson*, 2004-NMSC-029, ¶ 11 (quoting *Delaware v. Van Arsdall*, 475 U.S. 673, 684 (1986)). These considerations, we are careful to note, are not a substitute "test" provided in place of *Moore*; for instance, "improperly admitted evidence that is cumulative[7] is not *ipso facto* harmless beyond a reasonable doubt." *Johnson*, 2004-NMSC-029, ¶ 37.

**{44}** Reviewing courts must keep in mind that harmless error review necessarily requires a case-by-case analysis. *See Sullivan v. Louisiana*, 508 U.S.275, 279 (1993) ("The inquiry . . . [is] whether the guilty verdict actually rendered in *this* trial was surely unattributable to the error."); *see also Macias*, 2009-NMSC-028, ¶ 37 ("[H]armless error analysis requires an appellate court to review the effect of an error in the unique context of the specific evidence presented at a given trial."). When assessing two cases that are factually analogous, with similar errors, the reviewing court thus may find the impact of the error harmful in one case and harmless in the other. In addition, because an error may be prejudicial with respect to one conviction, but harmless with respect to another, courts must separately assess the effect the error may have had on each of the defendant's convictions. *See Johnson*, 2004-NMSC-029, ¶ 31.

## C. Admission of the Romeros' Convictions Was Not Harmless

**{45}** Having clarified how courts are to analyze harmless error, we return to a consideration of whether the erroneous admission of the Romeros' convictions at Defendant's trial was harmless. As we have discussed, the district court effectively admitted evidence of the convictions in violation of Defendant's right of confrontation under the Sixth Amendment. The error, therefore, was a constitutional error, which is harmless only if we conclude that there is no reasonable possibility the error contributed to the jury's decision to convict Defendant. *See Barr*, 2009-NMSC-024, ¶ 53; *see also Zamarripa*, 2009-NMSC-001, ¶ 52 ("When a statement is admitted in violation of the Confrontation Clause, we next inquire into whether the error was harmless," and "[t]o preclude reversal, the error must be harmless beyond a reasonable doubt.").

**{46}** Here, the State fails to meet its burden to show that there was no reasonable possibility that admission of the Romeros' convictions affected the jury's verdict. First, we note that the State introduced considerable evidence in support of Defendant's conviction for first-degree murder, kidnapping, and the conspiracy charges, although most of the evidence directly linking Defendant to those crimes came from a single witness, Michelle

---

[7] We explained in *Johnson* that "[c]orroborative evidence tends to corroborate or to confirm, whereas cumulative evidence merely augments or tends to establish a point *already proved* by other evidence." 2004-NMSC-029, ¶ 39 (internal quotation marks and citation omitted).

17

Martinez. According to her testimony, Defendant conferred with Ivan Romero about "what to do" with Victim, and later initiated a similar discussion with Elias Romero, Jaime Romero, and Martinez herself, after telling the others that he had Victim tied up at Richard Anaya's house. During that later discussion at Elias Romero's house, Defendant warned the others against letting Victim go free. Defendant traveled with Martinez and Luis Trujillo to Anaya's house where Victim was being held, and once there assisted Trujillo and Lawrence Gallegos in moving Victim after he was injected with heroin. Defendant helped carry the then-unconscious Victim to his own car, drove to the church parking lot where Victim's car would be left, discussed with Gallegos the plan to burn Victim's car with Victim inside, and proceeded to enact that plan by using a cherry bomb to set Victim's car ablaze.

**{47}** Martinez's testimony strongly implicated Defendant in the kidnapping and murder of Victim, as well as in the conspiracy to commit those acts. Martinez, however, was herself an active co-conspirator in the crimes committed against Victim, and therefore was subject to extensive cross-examination on her credibility and motives. In response to defense counsel's questioning, Martinez testified that she initially told Detective Wentz that Defendant had injected Victim with heroin, later changed her story to indicate that Elias Romero had done so, and only after four interviews with investigators admitted her own involvement in Victim's killing. Martinez admitted lying about other material facts, including the whereabouts of the syringe used to inject Victim with heroin. Defense counsel further attempted to impeach Martinez's credibility by asking her if she "cut a deal with the State" in exchange for her testimony, and by getting Martinez to acknowledge that she faced a sentence of 108 years for various charges, including the murder of Victim, but as a result of her plea agreement was sentenced to a maximum of only fifteen years. In addition, defense counsel elicited testimony from Martinez that she faced additional charges for unrelated criminal acts, including forgery, larceny and credit card fraud.

**{48}** In contrast to Martinez, whom defense counsel characterized in his closing argument as telling "lie, after lie, after lie," as being a long-time resident of the "drug world," and as being driven by a desire to reduce her own sentence by cooperating with the prosecution, Jaime Romero and Ivan Romero could not be questioned about their credibility or motives because they did not testify. Martinez's plea deal, criminal history, and prior false statements to law enforcement all could have provided the jury with legitimate reasons to doubt her testimony. *See State v. Martinez*, 1996-NMCA-109, ¶ 17, 122 N.M. 476, 927 P.2d 31 ("A jury, when judging a witness's credibility, should be able to take into consideration whether a witness hoped to curry favor by cooperating with the prosecution." (emphasis omitted)). In this light, the Romeros' convictions provided a potentially important and unimpeachable piece of evidence that a criminal conspiracy to kill Victim had occurred, and that such conspiracy included two men who were linked with Defendant through the testimony of Martinez and several other witnesses.

**{49}** Although the error here–the district court's instruction to the jurors that they "must

18

accept as true" the fact that "Jaime and Ivan Romero had been convicted of conspiracy to commit second-degree murder"–was only uttered once, it cannot be characterized as a stray remark. Trial testimony associated Ivan Romero with Defendant in myriad ways. He sold drugs to Victim, a close friend of Defendant; was reported to have disliked Victim; approached Defendant and Victim in the sports bar parking lot and attacked Victim in the evening before Victim's death; and spoke with Defendant about "what to do" with Victim. In addition, on the night of Victim's death several phone calls were made between Ivan Romero's cell phone and Anaya's home phone, a fact that the prosecutor referenced in his closing argument. Ivan Romero also was explicitly identified as having been "involved" in Victim's death. Perhaps most vividly, Defendant invoked Ivan Romero as the reason why Victim was being injected with an apparently lethal dose of heroin when Defendant told Victim that "he shouldn't have fucked with Diablo," a nickname for Ivan Romero.

**{50}**    Much less trial evidence connected Jaime Romero to Defendant, although Martinez testified that Jaime Romero told Defendant and others that his (Jaime Romero's) "soldiers" could "take care of" Victim, and in his closing argument the prosecutor suggested that Defendant had entered into a conspiracy with Jaime Romero. The fact that the Romeros were not only charged but convicted of conspiracy to murder Victim strengthened the State's case that a conspiracy existed and that Defendant was a part of that conspiracy. *See Urioste*, 94 N.M. at 768-69, 617 P.2d at 157-58 (quoting the State's argument that a co-defendant's conviction for conspiracy was relevant to prove that a conspiracy existed and that the defendant was part of the conspiracy).

**{51}**    Here, the Romeros' convictions were brought to the jury's attention by the district court rather than by the prosecutor or witness testimony. No curative instruction could be given, and the improperly admitted evidence bore the imprimatur of judicial authority. *See generally State v. Caputo*, 94 N.M. 190, 192, 608 P.2d 166, 168 (1980) ("[B]ecause of the judge's position and the respect and confidence reposed in him (or her) and in his learning and assumed impartiality, a jury is likely to attach undue weight to any participation by the judge in the conduct of the trial."). Although the district court's instruction to the jury was somewhat contradictory and reflected its attempt to reach a compromise between the State's and Defendant's positions regarding admission of the convictions, the district court invited the jury to utilize the convictions to bolster the State's case if they chose to do so.

**{52}**    In addition, the district court's statement about the Romeros' convictions was the last piece of information that the jury received before formal instructions and closing arguments, magnifying the risk that the error would factor into the jury's assessment of Defendant's guilt. *See generally State v. Sosa*, 2009-NMSC-056, ¶ 24, 147 N.M. 351, 223 P.3d 348 (discussing questionable comments made during closing arguments and warning of the increased potential for prejudice due to the proximity to the end of trial); *Caputo*, 94 N.M. at 192, 608 P.2d at 168 ("[T]he information elicited [by the trial court] was the last evidence of the trial heard by the jury and its significance in all probability was pondered during the jury's deliberations.").

19

**{53}** Finally, although Jaime Romero and Ivan Romero were convicted only of conspiracy to commit murder, while Defendant was convicted of the additional crimes of first-degree murder and kidnapping, there is at least a reasonable possibility that admission of the Romeros' convictions affected the verdict in its entirety. The dissent is correct that first-degree murder and kidnapping are separate offenses from conspiracy–and therefore require proof of different elements for conviction. The evidence concerning the conspiracy and the substantive crimes, however, was significantly intertwined. The jury heard testimony about the altercation between Ivan Romero and Victim that apparently set the entire criminal venture in motion, Defendant's statement implying that Victim would die because he had crossed Ivan Romero, and suggestions that both Ivan Romero and Jaime Romero made to Defendant about "what to do" with Victim. Any possible ambiguity about what Ivan Romero or Jaime Romero may have meant when they discussed "what to do" with Victim would have been dispelled by Martinez's testimony that Elias Romero then told her "to go and do it," which as she elaborated meant to "inject [Victim] and make it look like he overdosed" in order to kill him. The jury also heard testimony that while Victim was tied up at Anaya's house, someone (whom the prosecutor implied, and the jury certainly could have inferred, was Defendant) placed multiple calls from Anaya's home phone to Ivan Romero's cell phone. According to Martinez, after setting Victim's car on fire Defendant went to Ivan Romero's home and watched smoke rising from the burning car. Defendant's main concern, after watching Victim's car burn, was that he had "disrespected Ivan by taking [Victim] to the bar in the first place."

**{54}** All of the substantive crimes charged against Defendant were based on an accessory theory of liability. A defendant may be convicted of a crime as an accessory if that defendant "procures, counsels, aids or abets in its commission and although he did not directly commit the crime and although the principal who directly committed such crime has not been prosecuted or convicted." NMSA 1978, § 30-1-13 (1972); *see also State v. Carrasco*, 1997-NMSC-047, ¶ 6, 124 N.M. 64, 946 P.2d 1075 ("A person who aids or abets in the commission of a crime is equally culpable as the principal."). Here, the prosecutor emphasized this point in his closing argument, reminding the jury that "the law says that if you help, encourage or cause a crime to be committed, you can be just as guilty as the one who did the crime. Just as guilty. Why? I think it's obvious. Because if it weren't for those acts of encouragement, of help, of assistance some of those crimes wouldn't even be committed." The district court then gave the jury the following instruction regarding accessory liability:

> The defendant may be found guilty of a crime even though he himself did not do the acts constituting the crime, if the state proves to your satisfaction beyond a reasonable doubt that:
> 1.    The defendant intended that the crime be committed;
> 2.    The crime was committed;
> 3.    The accused helped, encouraged or caused the crime to be committed.

20

Regarding conspiracy, the district court instructed the jury that to find Defendant guilty of the conspiracy crimes, the State must prove beyond a reasonable doubt that "[t]he defendant and another person by words or acts agreed to commit [the specified crime]," and that "[t]he defendant and the other person intended to commit [the specified crime]."

{55}     Accessory liability and conspiracy "are distinct and separate concepts," *State v. Baca*, 1997-NMSC-059, ¶ 46, 124 N.M. 333, 950 P.2d 776 (citation omitted), with the "gist" of conspiracy being "an agreement between two or more persons to commit a felony." *Gallegos*, 2011-NMSC-027, ¶ 25 (quoting *State v. Deaton*, 74 N.M. 87, 89, 390 P.2d 966, 967 (1964)).  It is apparent, however, that much of Martinez's trial testimony could be used to support both the conspiracy and the substantive charges against Defendant.  For example, Martinez's statement that Ivan Romero and Defendant discussed "what to do" with Victim could provide evidence both that Defendant "helped" or "encouraged" the kidnapping and murder of Victim (accessory liability), as well as that Defendant "by words or acts agreed to commit" and "intended to commit" those crimes (conspiracy liability).  The prosecutor acknowledged this substantial evidentiary overlap during his closing argument, asking the jury to apply the "same analysis" from the substantive crimes to the parallel conspiracy charges and even noting that the conspiracy charges involve the "same elements" as their substantive counterparts.  Under these circumstances, it would be unreasonable to simply assume that the jurors separated the concepts of conspiracy and accessory liability, and considered the Romeros' convictions when deliberating on the conspiracy charges but not when deliberating on the charges of carrying out the object of that same conspiracy.

{56}     In the dissent's view, Defendant's convictions for first-degree murder and kidnapping should be affirmed because "direct" evidence in the form of Martinez's testimony "convinced the jury of Defendant's guilt, wholly apart from the misbegotten evidence of the conspiracy pleas of others."  But the fact that other evidence apart from the error supports conviction, even if that evidence is overwhelming, cannot be the determinant of whether the error is harmless.  *See Johnson*, 2004-NMSC-029, ¶ 11 ("[C]onstitutional error must not be deemed harmless solely based on overwhelming evidence of the defendant's guilt.").  Furthermore, the jury here had at least some serious doubts about Martinez's credibility, because it acquitted Defendant of the aggravated arson and conspiracy to commit aggravated arson charges, which like the first-degree murder and kidnapping charges (and their conspiracy counterparts) were supported almost exclusively by Martinez's testimony.

{57}     Evaluating harmless error, as our discussion indicates, can be a complex and difficult process.  In the final analysis, determining whether an error was harmless requires reviewing the error itself and its role in the trial proceedings, and in light of those facts, making an educated inference about how that error was received by the jury.  This process comes down to a judgment call based on experience and analysis, and as with many human judgments, reasonable minds may often differ.  Our review and consideration of the evidence in this case persuades us that there is a reasonable possibility that admitting the Romeros' convictions contributed to Defendant's convictions. The district court's error, therefore, was

21

not harmless.

## III.    CONCLUSION

**{58}**    We vacate Defendant's convictions and remand the case to the district court  for proceedings consistent with this Opinion.

**{59}**    **IT IS SO ORDERED.**

                                                  _____

                                                  **PATRICIO M. SERNA, Justice**

**WE CONCUR:**

_____

**CHARLES W. DANIELS, Chief Justice**

_____

**PETRA JIMENEZ MAES, Justice**

_____

**EDWARD L. CHÁVEZ, Justice**

**RICHARD C. BOSSON, Justice ( concurring in part and dissenting in part)**

**BOSSON, Justice (concurring in part and dissenting in part).**

**{60}**    I concur in the majority's analysis of the trial court's error.  The majority's revitalized analysis of harmless error is commendable, leading hopefully, to a clearer, more consistent application of the relevant standards for deciding that important question.  It is the result in this particular case, however, with which I cannot agree. More specifically, I am not persuaded to reverse Defendant's convictions for first-degree murder and kidnapping.  I do agree that we must reverse the convictions for conspiracy.

**{61}**    It is relatively easy to conclude that the conspiracy offenses cannot stand.  If A is accused of conspiring with B and C, and the jury hears evidence that the latter two have already been found guilty of that same conspiracy, well then, the prosecution is more than half way home without even firing a shot.  Common sense and common experience teach that the state cannot carry its burden on the question of harmless error.  No one could conclude that there is no reasonable *possibility* of any effect on the jury from such erroneous evidence with respect to the convictions for conspiracy.

**{62}**    I cannot reach the same conclusion, however, regarding Defendant's convictions for first-degree murder and kidnapping.  Defendant was convicted of these crimes, either as a principal or an accessory, based upon direct, eyewitness evidence demonstrating his

22

presence at and active participation in most of the horrifying events of that evening, including murder and kidnapping. This eyewitness testimony was, I concede, subjected to forceful cross-examination and impeachment on a variety of grounds. But in my mind that eyewitness convinced the jury of Defendant's guilt, wholly apart from the misbegotten evidence of the conspiracy pleas of others. I cannot join in a conclusion that the jury may have reached a decision based not upon direct evidence of guilt, but upon evidence that someone else was guilty of a different, albeit related, crime.

**{63}**   With respect, therefore, I would affirm the convictions for murder and kidnapping while I join in reversing the convictions for conspiracy.

_____
**RICHARD C. BOSSON, Justice**

**Topic Index for *State v. Tollardo*, Docket No. 31,241**

**AE**   **APPEAL AND ERROR**
   AE-AG         Appeal and Error, General
   AE-HE         Harmless Error
   AE-PJ         Prejudicial Error

**CT**   **CONSTITUTIONAL LAW**
   CT-CT         Confrontation
   CT-FT         Fair Trial
   CT-RF         Right to Confrontation

**CL**   **CRIMINAL LAW**
   CL-AC         Accessory
   CL-CS         Conspiracy

**CA**   **CRIMINAL PROCEDURE**
   CA-BP         Burden of Proof
   CA-FT         Fair Trial
   CA-GP         Guilty Plea
   CA-PJ         Prejudice
   CA-RT         Right to Confrontation
   CA-SF         Standard of Proof

**EV**   **EVIDENCE**
   EV-AE         Admissibility of Evidence
   EV-CR         Credibility of Witness
   EV-IM         Impeachment

**JR**   **JURIES**
   JR-JG         Juries, General

23