## IN THE COURT OF APPEALS OF THE STATE OF NEW MEXICO

Opinion Number: _____

Filing Date:  March 17, 2014

Docket No. 32,451

STATE OF NEW MEXICO,

      Plaintiff-Appellee,

v.

BRUCE SCHWARTZ,

      Defendant-Appellant.

APPEAL FROM THE DISTRICT COURT OF BERNALILLO COUNTY
Robert S. "Bob" Schwartz, District Judge

Gary K. King, Attorney General
James W. Grayson, Assistant Attorney General
Santa Fe, NM

for Appellee

Law Office of Adrianne R. Turner
Adrianne R. Turner
Albuquerque, NM

for Appellant

## OPINION

**BUSTAMANTE, Judge.**

**{1}**     Bruce Schwartz (Defendant) asserts that his rights under the confrontation clauses of the United States and New Mexico Constitutions were violated when the district court permitted four witnesses to testify by two-way video over the Internet without the necessary findings that use of video was necessary.  We agree and, because there is no reasonable possibility that the video testimony did not affect the verdict, conclude that the testimony was not harmless.  Consequently, we reverse Defendant's convictions. Concluding there is sufficient evidence to support Defendant's convictions, we also remand for retrial.

1

**BACKGROUND**

**{2}** In March 2008 Martha McEachin left her home in Los Angeles on a train bound for Albuquerque, intending to begin writing a long-planned novel in Mexico. After arriving in Albuquerque, McEachin lived with Defendant for approximately one and a half months before she disappeared. In May, a badly decomposed body was discovered wrapped in a blue air mattress and sheets and covered with a mattress in an alley approximately 500 feet from Defendant's apartment.

**{3}** After a two-year investigation, Defendant was charged with McEachin's murder and tampering with evidence. He was convicted by a jury of second degree murder and tampering with evidence and sentenced to fifteen years in the Department of Corrections. Additional facts are included in our discussion of Defendant's points on appeal.

**DISCUSSION**

**{4}** Defendant makes a number of arguments based on allegations of error in the admission or exclusion of evidence. Because we conclude that Defendant's confrontation rights were violated and that the violation was not harmless, we reverse Defendant's convictions. We also conclude that there is sufficient evidence of Defendant's guilt to permit retrial on remand. Given the disposition of these issues, we do not address Defendant's other arguments.

**A.     Confrontation Clause**

**{5}** At trial, four of the State's witnesses testified using Skype, an "Internet software application[] that . . . allow[s] users to engage in real time video and audio communications between two or more locations." 131 Am. Jur. Trials 475 § 1 (2014). Defendant argues that admission of their testimony via Skype violated his rights under the Sixth Amendment to the United States Constitution and Article II, Section 14 of the New Mexico Constitution. Both the Federal and New Mexico constitutions provide that "[i]n all criminal prosecutions, the accused shall enjoy the right . . . to be confronted with the witnesses against him[.]" *See* U.S. Const. amend. VI; N.M. Const. art. II, § 14. We will refer to the clause in both constitutions as "the confrontation clause."

**{6}** "[T]he [c]onfrontation [c]lause guarantees the defendant a face-to-face meeting with witnesses appearing before the trier of fact." *Coy v. Iowa*, 487 U.S. 1012, 1016 (1988). But a defendant's rights under the confrontation clause are not absolute. *See State v. Almanza*, 2007-NMCA-073, ¶ 8, 141 N.M. 751, 160 P.3d 932. Rather, they "may give way to other important interests" when those interests are "narrowly tailored to include only those situations where the exception is necessary to further an important public policy." *Id.* (internal quotation marks and citations omitted). Thus, there must be "a particularized showing of necessity in the service of an important public policy before a court may approve an exception to physical presence." *State v. Smith*, 2013-NMCA-081, ¶ 8, 308 P.3d 135,

2

*cert. denied*, 2013-NMCERT-006, 304 P.3d 425. "The necessity must be supported by specific findings by the trial court." *Id.* ¶ 5.

**{7}**     "[M]ere inconvenience to the witness is not sufficient to dispense with face-to-face confrontation." *State v. Chung*, 2012-NMCA-049, ¶ 11, 290 P.3d 269 (internal quotation marks and citation omitted), *cert. quashed*, 2013-NMCERT-003, 300 P.3d 1182. Thus, this Court has reversed convictions where a witness testified via video or telephone conference when (1) the witness was located in Santa Fe and the hearing was held in Aztec, New Mexico, *see id.* ¶ 3; (2) the witness would have had to travel seven hours and be absent from the State Laboratory Division when it was shorthanded, *see Smith*, 2013-NMCA-081, ¶¶ 2, 11; and (3) when a chemist with the state crime lab was called on short notice and had a "busy schedule," *Almanza*, 2007-NMCA-073, ¶ 12. Our review of confrontation issues is de novo. *See Smith*, 2013-NMCA-081, ¶ 3.

**The District Court Erred in Permitting Video Testimony**

**{8}**     An FBI agent, two forensic scientists, and Defendant's mother testified via video. The State concedes that it "did not list any reason for the video testimony" of FBI Agent Bas or forensic scientist Gross "other than their residing outside of New Mexico." Additionally, it acknowledges that "the district court failed to make individualized factual findings [as] required to excuse [forensic scientist Pearn's] in-person appearance." Thus, it concedes that "[t]hese witnesses' testimony violated Defendant's confrontation rights." Although we are not bound by this concession, we agree with this conclusion because the district court failed to make specific findings supporting its conclusion that video testimony by these witnesses was necessary. *See id.* ¶ 5 ("The necessity must be supported by specific findings by the [district] court.").[1]

**{9}**     Whether it was error to permit Defendant's mother, Patricia Labance, to testify via video presents a more complex question. As justification for permitting Labance to appear by video, the State argued that "Labance was born in 1938 and resides in Florida. . . . Labance currently suffers from severe stress, anxiety[,] and depression." It attached a letter from Labance's doctor, which stated that "this patient is suffering from severe stress, anxiety[,] and depression and is physically and psychologically unable to travel out of the state for the for[e]seeable future." At the hearing on the motion, the district court inquired into the substance of Labance's testimony and discussed with the parties how Skype works. Although the State said that Labance was available to speak to the district court, no evidence was taken at the hearing. The State also said that "[Labance was] not happy to be coming out here. She hasn't seen her son in a number of years. But she will come if necessary, but because of her failing health, . . . we'd like to do her [testimony via] live video." The State

---

[1]The State requests that this Court reconsider its holding in *Smith* that two-way "video testimony does not itself 'satisfy' the requirements of the [confrontation clause]." *Id.* ¶ 7. We decline to do so.

3

also distinguished *Chung*, in which this Court held that a defendant's confrontation rights were violated when the district court permitted video testimony based on a witness's seven-hour travel time, by arguing that "in our case, the travel is so much further and costly." *See Chung*, 2012-NMCA-049, ¶ 12. After argument, the district court stated that, "given the letter from [Labance's doctor] describing [Labance], I'm going to allow her to testify via . . . Skype[.]" The district court did not make written findings.

**{10}** The State arranged for Labance to testify via Skype from a courthouse in Naples, Florida. During cross-examination, Defendant questioned Labance about her health. Labance testified that she was nervous and that the trial was "upsetting." In addition, counsel for Defendant and Labance had the following exchange.

> Q:    . . . What type of health issues are you dealing with right now, ma'am?
>
> A:    Well, physically I have arthritis really bad. Mentally, I've been very stressed, anxious. I've been very depressed over this whole situation.
>
> Q:    And arthritis would be the main medical diagnosis you're suffering from?
>
> A:    Yes.
>
> Q:    Do you have trouble breathing?
>
> A:    Not necessarily, no.

**{11}** After cross-examination was completed, Defendant moved for Labance's testimony to be stricken from the record. A bench conference was held. Defendant argued that, based on Labance's testimony, there was "no decent reason" that Labance could not have traveled to New Mexico to testify and that, therefore, his confrontation rights had been violated. The district court expressed some confusion about the contents of the doctor's letter, asking, "Is the doctor specific as to diagnoses, or is it general issues regarding health[?]" It is not clear from the record whether the letter was produced for the district court's review during the bench conference. Ultimately, the district court denied Defendant's motion stating, "None of us are doctors, and we don't have the medical records. I'm going to accept, again on the basis of good faith, that there's a legitimate basis for [Labance to appear] by the Skype."

**{12}** We interpret the district court's statements to be a finding that it was medically necessary for Labance to testify via video. *See Smith*, 2013-NMCA-081, ¶ 9 (citing *Commonwealth v. Atkinson*, 2009 PA Super 239, ¶ 12, in which that court held that adult witnesses may testify by video only "when a witness is too ill to travel and when a witness is located outside of the United States") (internal quotation marks and citation omitted)). In doing so, we note that the district court's oral comments are perilously close to being

4

inadequate for appellate review and note again that "[t]he necessity [for video testimony] must be supported by specific findings by the trial court." *Id.* ¶ 5; *see State v. Benny E.*, 1990-NMCA-052, ¶ 11, 110 N.M. 237, 794 P.2d 380 ("Absent findings indicating the [district] court was persuaded and why, the decision to deny a defendant his or her right of confrontation cannot be adequately reviewed on appeal."). The State argues that, because the district court's finding was supported by the "medical judgment" in the doctor's letter, we must affirm. We disagree that the letter alone is sufficient to demonstrate a compelling need to protect the witness as required to outweigh Defendant's rights under the confrontation clause.

**{13}** "[A]ny exceptions to the general rule providing for face-to-face confrontation [must be] narrowly tailored." *Chung*, 2012-NMCA-049, ¶ 11 (internal quotation marks and citation omitted); *see Smith*, 2013-NMCA-081, ¶ 9 (stating that "[c]ourts define [policy concerns that outweigh the defendant's confrontation rights] narrowly"). Given the importance of the confrontation right and the narrowness of the exceptions to it, we conclude that the doctor's letter was inadequate as a matter of law to support a conclusion that Labance could not testify in person. *See id.* ¶ 15 (stating that "the reasons articulated by the district court for finding it necessary to allow the use of video testimony were insufficient as a matter of law to support its use"); *see, e.g.*, *Bush v. State*, 2008 WY 108, ¶ 52, 193 P.3d 203 (Wyo. 2008) (medical necessity supported where the district court considered medical records); *State v. Sewell*, 595 N.W.2d 207, 211 (Minn. Ct. App. 1999) (medical necessity supported where the witness's doctor indicated by affidavit and through telephone contact with the court that the witness was too ill to travel); *cf. State v. Tafoya*, 1988-NMCA-082, ¶ 16, 108 N.M. 1, 765 P.2d 1183 (finding of necessity for use of video depositions of child witnesses at trial supported by substantial evidence where there was a "full day of testimony" by experts and the witnesses' parents); *State v. Vigil*, 1985-NMCA-103, ¶¶ 6-7, 103 N.M. 583, 711 P.2d 28 (finding of necessity for video deposition of a child witness supported by substantial evidence where the state presented expert testimony on the possible impact on the witness of in-person testimony). The fact that the State conceded that Labance could travel to New Mexico to testify if necessary simply highlights the inadequacy of the evidence behind the district court's conclusion.

**{14}** Based on the foregoing, we conclude that it was error to permit video testimony by Bas, Gross, Pearn, and Labance because the necessity for video testimony was not supported by sufficient findings.

**With One Exception, Admission of Video Testimony Was Not Harmless**

**{15}** A violation alone, however, does not require a new trial. Rather, only when a violation of the confrontation clause is harmful to the defendant does the violation require a new trial. *See State v. Tollardo*, 2012-NMSC-008, ¶ 25, 275 P.3d 110 ("Improperly admitted evidence is not grounds for a new trial unless the error is determined to be harmful."). The State bears the burden of demonstrating that the error was harmless. *See State v. Gutierrez*, 2007-NMSC-033, ¶ 18, 142 N.M. 1, 162 P.3d 156.

5

**{16}** To determine whether an error in admission of evidence is harmless, this Court reviews "the error itself, including the source of the error and the emphasis placed on the error at trial. To put the error in context, we often look at the other, non-objectionable evidence of guilt, not for a sufficiency-of-the-evidence analysis, but to evaluate what role the error played at trial." *State v. Leyba*, 2012-NMSC-037, ¶ 24, 289 P.3d 1215. In addition, "courts may, depending upon the circumstances of the cases before them, examine the importance of the erroneously admitted evidence in the prosecution's case, as well as whether the error was cumulative or instead introduced new facts." *Tollardo*, 2012-NMSC-008, ¶ 43 (alterations, internal quotation marks, and citations omitted). Whether certain evidence is harmless depends on a variety of factors unique to each case. *See id.* ¶ 44 ("Reviewing courts must keep in mind that harmless error review necessarily requires a case-by-case analysis.").

**{17}** We begin by addressing the testimony presented by video related to DNA analyses, then turn to Labance's testimony. The State presented four forensic scientists, of which two—Pearn and Gross—testified by video. Pearn developed a DNA profile of McEachin based on DNA found on McEachin's shoes. She also tested DNA found on the waistband of a pair of jeans found near the body. She concluded that "neither [the victim] or [Defendant] could be excluded as contributors to [the DNA on the waistband]." Thus, Pearn's work (1) resulted in a DNA profile of the victim, and (2) provided a possible link between the body and Defendant.

**{18}** Gross tested a femur taken from the body, created a DNA profile for the femur, and then compared that profile to the DNA profile of McEachin's daughter. The daughter's DNA profile had been completed by an analyst at the Federal Bureau of Investigation (FBI) and provided to Gross. Gross identified the DNA types in common between the two samples and testified that it was "42,000 times more likely to observe th[e common] genetic information if [the daughter] was the true biological daughter [of the victim] as compared to an untested random woman from the population." The bulk of Ms. Gross's testimony thus went to identification of the body as McEachin's.

**{19}** Bas testified that he obtained a blood sample from McEachin's daughter that was then forwarded to the FBI for analysis. Bas's testimony went to a portion of the chain of events that led to the daughter's sample being analyzed by the FBI and then compared to the profile of the body by Gross, thus leading to identification of the body as McEachin's.

**{20}** There is no reasonable possibility that Bas's testimony had the evidentiary importance to impact Defendant's conviction. Bas testified only about how he collected blood from McEachin's daughter and sent it to the Albuquerque field office of the FBI. At the hearing on the State's motion to permit video testimony, Defendant stipulated that Bas's testimony only established a chain of custody of the daughter's sample and, on appeal, Defendant does not address how he was prejudiced by Bas's testimony at all. In the context of this case and in light of the totality of the circumstances surrounding the testimony, we conclude that Bas's testimony by video was harmless.

**{21}** The same is not true of the testimony by forensic scientists Pearn and Gross. The State argues that their testimony was harmless for two reasons. It first argues that because Defendant had an opportunity to cross-examine the witnesses, the use of video had "only a marginal impact on his right of confrontation." It contends secondly that the video testimony was "relative[ly] insignifican[t] . . . in comparison to the overall evidence of guilt." Despite these efforts to minimize the role of the video testimony in the State's case, we conclude that the video testimony was critical to identification of the body and association of Defendant with the body, both of which were essential to the State's case. Hence, there is no reasonable possibility that this evidence did not contribute to Defendant's conviction. *See id.* ¶ 45.

**{22}** In its first contention, the State argues that "Defendant had the ability to cross-examine all of the witnesses appearing by video conference in full view of the jury such that there was only a marginal impact on his right of confrontation." *Cf. State v. Lopez*, 1996-NMCA-101, ¶ 14, 122 N.M. 459, 926 P.2d 784 ("The right to cross-examination is viewed as the most important element of the right of confrontation."). The State argues that Defendant's limited cross-examination of the witnesses "show[s] that the video testimony had no impact on the trial or the jury's verdict." Although a defendant's cross-examination of witnesses may be considered in assessing the role of evidence at trial, whether and how Defendant cross-examined the witnesses is not dispositive of the ultimate question of harmlessness because that analysis focuses on whether the evidence affected the verdict, not how Defendant responded to it. *See State v. Serna*, 2013-NMSC-033, ¶ 25, 305 P.3d 936 (discussing the defendant's cross-examination as part of the assessment of the amount of emphasis placed on erroneously admitted evidence); *Tollardo*, 2012-NMSC-008, ¶ 42 ("[T]he central inquiry of [the harmless error analysis is] whether an error was likely to have affected the jury's verdict."). Because the State's argument shifts the focus away from this central inquiry, we are unpersuaded. Thus, we turn to the State's contentions as to the role of Pearn's and Gross's testimony at the trial and its impact on the jury.

**{23}** The State's second argument is that Gross's and Pearn's testimony was insignificant in comparison to the overall evidence of guilt. Specifically, it argues that (1) the video testimony as to identity was duplicative of other evidence and therefore insignificant, and (2) the video testimony tying Defendant to the body was of "minor significance" compared to evidence of "the victim's blood on the carpet in Defendant's bedroom," which was established through in-person testimony. We address these arguments in turn.

**{24}** We disagree that the video testimony as to identity was duplicative and therefore harmless for two reasons. First, the video testimony was not merely cumulative of other evidence. Although in-person testimony by McEachin's friends described her physical features, and the jury could infer from other in-person testimony that those features matched the body, the State nevertheless devoted a substantial amount of time presenting DNA evidence to establish identity. Three different analyses were conducted to do so: Pearn developed a profile using DNA from shoes belonging to McEachin, Gross developed a profile from a femur of the body and compared it to McEachin's daughter's profile, and a

7

third witness, testifying in person, compared the Pearn and Gross profiles and found that they matched. The State's attempt to minimize the importance of the DNA evidence is belied by the amount of time and effort the State took to present the DNA evidence and the emphasis placed on it. Indeed, the State itself described the body's characteristics as less probative than the DNA evidence in its opening argument. We cannot conclude that the video testimony did not have an impact on the verdict simply because there was also in-person testimony on the identity of the body. Second, even if the video testimony was cumulative, "improperly admitted evidence that is cumulative is not *ipso facto* harmless beyond a reasonable doubt." *Tollardo*, 2012-NMSC-008, ¶ 43 (footnote, internal quotation marks, and citation omitted). Rather, even cumulative evidence may be harmful if it had an impact on the jury's verdict.

**{25}** To the extent the State also argues that Defendant did not contest that the body was McEachin's and therefore any improperly admitted testimony on that issue was harmless, we disagree. We note first that at trial, the State acknowledged that Defendant "disput[ed] that it's even . . . McEachin's body[.]" In any case, whether Defendant disputed this fact is not conclusive of whether the testimony is harmless. In *State v. Sisneros*, our Supreme Court addressed a similar argument and held that erroneous admission of a forensic pathologist's testimony as to the cause of death was harmless because "the cause and manner of death were never in dispute, only the identity of the shooter." 2013-NMSC-049, ¶ 33, 314 P.3d 665. The premise underlying that holding is that there was nothing about the cause and manner of death that pointed to the defendant as the shooter. That premise does not apply here. In this case, Defendant did not contest that he knew McEachin and that she had lived with him briefly. Rather, he maintained in his statement to officers that she left his apartment and never returned. Thus, the identification of the body as McEachin's, coupled with the fact that McEachin had lived with Defendant until shortly before the body was found, implicated Defendant. This argument is unavailing.

**{26}** In its final argument, the State maintains that Pearn's testimony about the DNA found on the jeans "held only minor significance in tying Defendant to the scene where the body had been hidden" and that because the material—presumed to be blood—found in Defendant's apartment was "the most damning physical evidence[,]" the testimony about the jeans paled in comparison. As discussed, however, Defendant never denied that McEachin had lived with him and argued at trial that McEachin's DNA could have gotten on the carpet any number of ways during that time. In this context, the DNA on the carpet merely showed that McEachin had been in the apartment. Because Defendant did not dispute this fact, evidence tying Defendant to the body in the alley was critical to the State's case. We are unpersuaded by the State's characterization of the video testimony about the jeans in comparison to the DNA found on the carpet.

**{27}** Finally, the centrality of DNA evidence, including the video testimony, to the State's case is also evident in the State's opening and closing arguments. In its opening, the State referred to the jeans as "[Defendant's] jeans" and stated they were "[o]ne of the most important pieces of the evidence . . . at th[e] scene[.]" It described the DNA testing as

8

determinative that the jeans were Defendant's. It stated that Defendant "put his jeans, evidence of the murder" near the body. The State discussed the DNA testing of the femur from the body and McEachin's daughter, stating that the physical characteristics of the body did not allow the police to be "absolutely certain" of the identity of the body. In closing argument, the State referred to DNA evidence at least four times and devoted a substantial portion of its rebuttal argument to the jeans and DNA evidence related to them, referring to the jeans as "the one piece of evidence that could tie [Defendant] to th[e] body[.]" Based on the role Gross's and Pearn's testimony played in the State's case, we conclude that there is no reasonable possibility that the DNA evidence they presented did not contribute to Defendant's conviction. *See Leyba*, 2012-NMSC-037, ¶ 30 (stating that the use of the victim's diary at trial was not harmless where "[b]oth its placement and the repetitive manner in which the [s]tate referred to the diary during closing argument[] strongly suggest how useful it was to the [s]tate. As any good trial lawyer knows, a jury is most likely to remember the first and last things heard before retiring").

**{28}** We turn next to the question of whether Labance's testimony was harmless. Labance testified as to the nature of Defendant's relationship with McEachin, as well as how and when they met. She testified that she had sent Defendant a blue air mattress in early 2008, as well as a set of sheets, a blanket, and other household goods. She authenticated a receipt for those items that she had sent to a detective, which was admitted into evidence. The detective used the authenticated receipt to purchase an air mattress of the same model, a photo of which was also admitted into evidence. During trial, a photo of the air mattress found with the body was compared to the photo of the purchased air mattress. Labance also authenticated letters Defendant had sent her, which were then admitted into evidence. A detective later read the letters during his testimony. In one letter, Defendant acknowledged receipt of the air mattress and stated that he loved McEachin. In another, dated a little more than a week before the body was found, Defendant wrote that McEachin was "headed to El Paso a few weeks ago" and that she was going on to Juarez. Finally, Labance testified that Defendant told her he had given the air mattress away.

**{29}** The State concedes on appeal that it was "significant that Defendant's . . . air mattress and sheets [] were not only at the scene but wrapped around the victim." In its motion for video testimony, the State acknowledged that Labance's testimony was important not only to authenticate the receipt for the air mattress, sheets, and letters from him acknowledging receipt of those items, but also to establish Defendant's relationship with McEachin. Labance's testimony provided evidence that Defendant had owned a blue air mattress, as well as details about the air mattress that matched the one found with the body. In addition, her authentication of Defendant's letters allowed the State to use Defendant's own statements against him. Labance's testimony thus established a link between Defendant, the air mattress, and the body. Although the State argues that the documents could have been authenticated another way, the State chose to rely on Labance to get the documents admitted. Having made that choice, the State cannot now argue, simply because there was another method for admission of the documents, that the jury did not rely on Labance's testimony to convict Defendant. We conclude that Labance's testimony played

a key role in the State's case and that the State has failed to demonstrate that Labance's testimony was harmless.

## II.    SUFFICIENCY OF THE EVIDENCE

**{30}**    We next examine whether the evidence was sufficient to convict Defendant for second degree murder and tampering with evidence both because Defendant asserts the evidence was insufficient and because this Court must address sufficiency in order to determine whether retrial would offend principles of double jeopardy. *See State v. Cabezuela*, 2011-NMSC-041, ¶ 47, 150 N.M. 654, 265 P.3d 705 ("Because we find that there was sufficient evidence to convict [the d]efendant, . . . retrial is not barred by double jeopardy implications.").

**{31}**    In a review of the sufficiency of the evidence, "we [first] view the evidence in the light most favorable to the verdict, indulging all reasonable inferences and resolving all conflicts in the evidence in favor of the verdict." *State v. Armendariz-Nunez*, 2012-NMCA-041, ¶ 16, 276 P.3d 963, *cert. denied*, 2012-NMCERT-003, 293 P.3d 183. We "then . . . make a legal determination of whether the evidence viewed in this manner could justify a finding by any rational trier of fact that each element of the crime charged has been established beyond a reasonable doubt." *Id.* (internal quotation marks and citation omitted). "The reviewing court does not weigh the evidence or substitute its judgment for that of the fact finder as long as there is sufficient evidence to support the verdict." *State v. Mora*, 1997-NMSC-060, ¶ 27, 124 N.M. 346, 950 P.2d 789, *abrogated on other grounds as recognized by Kersey v. Hatch*, 2010-NMSC-020, ¶ 17, 148 N.M. 381, 237 P.3d 683. Defendant bears the burden of "identif[ying] with particularity the fact or facts that are not supported by substantial evidence" on appeal. Rule 12-213(A)(4) NMRA.

**{32}**    In an apparent attempt to reframe the standard of review, Defendant's only argument on appeal relies on *State v. Malouff*, a 1970 case in which this Court held that "when circumstances alone are relied upon, they must point unerringly to [the] defendants and be incompatible with and exclude every reasonable hypothesis other than guilt." 1970-NMCA-069, ¶ 3, 81 N.M. 619, 471 P.2d 189. Defendant's argument rests entirely on the premise that the State's case, being based on circumstantial evidence, failed to "exclude every reasonable hypothesis other than guilt." *Id.* But the standard stated in *Malouff* was expressly repudiated by our Supreme Court in *State v. Brown*. *See* 1984-NMSC-014, ¶ 7, 100 N.M. 726, 676 P.2d 253 (stating that "the traditional distinctions between direct and circumstantial evidence have been abolished" and that "[t]he only test recognized by [our Supreme] Court to test the sufficiency of evidence is whether substantial evidence of either a direct or circumstantial nature exists to support a verdict of guilt beyond a reasonable doubt with respect to every element essential to a conviction"); *see also State v. Garcia*, 2005-NMSC-017, ¶¶ 18, 19, 138 N.M. 1, 116 P.3d 72 (stating that "After *Brown*, . . . the proposition that substantial evidence in support of a conviction must be inconsistent with any reasonable hypothesis of innocence" is no longer the standard in New Mexico). Defendant's reliance on *Malouff* is, therefore, unavailing.

**{33}** Here, the State was required to prove that

1. [D]efendant killed . . . McEachin;

2. [D]efendant knew that his acts created a strong probability of death or great bodily harm to . . . McEachin or any other human being;

3. [D]efendant did not act as a result of sufficient provocation;

4. This happened in New Mexico on or between the 23rd day of April and the 14th day of May, 2008.

*See* UJI 14-210 NMRA. Other than asserting that circumstantial evidence is insufficient to support the verdict, Defendant makes no argument identifying which facts lack sufficient evidence. Although we generally do not address undeveloped arguments, we do so here in order to ascertain whether Defendant may be retried on remand. *See Cabezuela*, 2011-NMSC-041, ¶ 40.

**{34}** Here, the jury heard testimony that McEachin and Defendant lived together until a few weeks before the body was discovered and that they shared an intimate relationship. Testimony by detectives established that the body was found in an alley 500 feet from Defendant's apartment, wrapped in a blue air mattress and sheets, covered with another mattress. Defendant's mother testified that she had sent him a blue air mattress and sheet set as a gift. The jury saw photographs and heard testimony that grid marks on the air mattress looked like the grid of a shopping cart and that there was a shopping cart at the scene. They also heard testimony that Defendant had shopping carts in his apartment. They heard testimony that a pair of jeans with DNA on it—for which Defendant could not be ruled out as the source—was found near the body. A forensic scientist testified that McEachin's blood was found on the carpet in Defendant's apartment. There was also testimony that the cause of death was "multiple blunt force injuries . . . [to t]he head and chest area" and that Defendant gave two different explanations for why he no longer had the air mattress his mother sent him. Viewed in the light most favorable to the verdict and indulging all reasonable inferences in favor of conviction, this evidence was sufficient to permit the jury to find Defendant guilty of second degree murder.

**{35}** We turn to the charge of tampering with evidence. "Tampering with evidence is a specific intent crime, requiring sufficient evidence from which the jury can infer that the defendant acted with an intent to prevent apprehension, prosecution or conviction of any person or to throw suspicion of the commission of a crime upon another." *State v. Silva*, 2008-NMSC-051, ¶ 18, 144 N.M. 815, 192 P.3d 1192 *holding modified by State v. Guerra*, 2012-NMSC-027, ¶¶ 12-14, 284 P.3d 1076 (internal quotation marks and citation omitted); *see* NMSA 1978, § 30-22-5(A) (2003). The State was required to prove that

1. [D]efendant destroyed and/or changed and/or hid and/or fabricated

11

> and/or placed clothing belonging to himself and[/]or . . . Mc[E]achin and/or the body of . . . Mc[E]achin and/or her suitcases, her laptop, her printer, her purse[;]

> 2. [By doing so, D]efendant intended to prevent the apprehension, prosecution[,] or conviction of himself;

> 3. This happened in New Mexico on or between the 23rd day of April and the 14th day of May, 2008.

*See* UJI 14-2241 NMRA. The State concedes that it did not present direct evidence or evidence of "an overt act with respect to" McEachin's suitcase, purse, laptop, or printer. Nevertheless, any lack of evidence regarding McEachin's belongings does not require reversal here because there was sufficient evidence to support one or more of the other alternative bases for conviction. *See State v. Olguin*, 1995-NMSC-077, ¶ 2, 120 N.M. 740, 906 P.2d 731 ("[D]ue process does not require a guilty verdict to be set aside if an alternative basis of conviction is only factually inadequate to support a conviction.").

**{36}** In addition to tampering with McEachin's laptop, printer, purse, or suitcase, the jury instruction permitted conviction on the basis of tampering with Defendant's own clothing, the victim's clothing, or the victim's body. The jury could infer that Defendant placed the victim's body in the alley from the testimony that Defendant owned a blue air mattress and sheets, that the body was found wrapped in a blue air mattress and sheets, that clothes bearing his DNA were found with the body, and that the alley was approximately 500 feet from his apartment. In addition, there was testimony that a mattress was placed over the body in the alley. Although Defendant argues that this evidence is "only" circumstantial, New Mexico does not recognize a distinction between direct or circumstantial evidence, as previously discussed. We conclude that the evidence presented, viewed in the light most favorable to the verdict, was sufficient to permit the jury to infer that Defendant intended to "prevent [his] apprehension, prosecution, or conviction" by covering and placing the body in the alley. UJI 14-2241.

**{37}** In conclusion, there was sufficient evidence to support Defendant's convictions for second degree murder and tampering with evidence.

## III. CONCLUSION

**{38}** Having concluded that video testimony by Pearn, Gross, and Labance was admitted in error and that this error was not harmless, we reverse Defendant's convictions. In addition, since the evidence was sufficient for conviction of both second degree murder and tampering, we remand for a new trial. We need not address Defendant's other allegations of error in the admission of evidence.

**{39}** **IT IS SO ORDERED.**

                    _____

                    **MICHAEL D. BUSTAMANTE, Judge**

**WE CONCUR:**

_____

**MICHAEL E. VIGIL, Judge**

_____

**TIMOTHY L. GARCIA, Judge**