# IN THE COURT OF APPEALS OF THE STATE OF NEW MEXICO

**Opinion Number: 2019-NMCA-039**

**Filing Date: March 20, 2019**

**NO. A-1-CA-34617**

**STATE OF NEW MEXICO,**

Plaintiff-Appellee,

v.

**LEONARD TELLES,**

Defendant-Appellant.

**APPEAL FROM THE DISTRICT COURT OF DOÑA ANA COUNTY**
**Fernando R. Macias, District Judge**

Certiorari Denied, May 15, 2019, No. S-1-SC-37652. Released for Publication September 3, 2019.

Hector H. Balderas, Attorney General
Santa Fe, NM
Walter M. Hart, III, Assistant Attorney General
Albuquerque, NM

for Appellee

Robert E. Tangora, L.L.C.
Robert E. Tangora
Santa Fe, NM

for Appellant

## OPINION

**HANISEE, Judge.**

**{1}** A jury convicted Defendant Leonard Telles of second degree murder, kidnapping, attempted tampering with evidence, and two counts of tampering with evidence. On appeal, Defendant argues that (1) his right to a public trial was violated; (2) his convictions for kidnapping, attempted tampering with evidence, and tampering with evidence are not supported by sufficient evidence; and (3) his convictions for

kidnapping and attempted tampering with evidence violate double jeopardy. Defendant also seeks reversal of his convictions based upon cumulative error. Unpersuaded, we affirm.

## BACKGROUND

**{2}** Defendant beat Jerome Saiz (Victim) to death with a baseball bat. At trial, Defendant testified that he was at Victim's house, assisting Rebecca Gomez, Victim's ex-girlfriend, with packing so she could move out. At some point after Defendant and Ms. Gomez finished packing, Ms. Gomez's two young daughters alerted them that Victim had arrived. Defendant went into the living room where Victim and Ms. Gomez were arguing. Defendant testified that Victim was holding a baseball bat, seemed "high," and threatened Defendant. Defendant said that Victim "rushed" him, but that he fought Victim off and was able to take the bat away from Victim while Victim was making a phone call. Defendant testified that he warned Victim to stay away, but Victim came at him again, so he used the bat to defend himself.

**{3}** After the altercation, and seeing Victim lying on the ground unresponsive, Defendant believed Victim to be dead. Defendant told Ms. Gomez that they needed to leave Victim's house. Defendant covered Victim with a blanket and stashed the bat behind the washing machine. He then dragged Victim to a back bedroom, rolled him up in a carpet, and shut the door. Defendant next mopped the blood from the living room floor. He testified that he took these actions, not to prevent the police from finding Victim's body or to conceal evidence, but to prevent Ms. Gomez's two daughters from seeing the body or the blood and getting upset.

**{4}** Defendant testified that he believed Victim was dead when he dragged him to the back bedroom, but that when he heard police knocking at the door, he "panicked" and began pacing throughout the house. He went to check on Victim, heard Victim making loud snoring noises, and decided to inform the officers that Victim was "knock[ed] . . . out." Defendant also told the officers two things that he admitted at trial were false: first, that Victim had broken into the home—which Defendant misrepresented to the officers as belonging to Ms. Gomez—in the middle of the night; and second, that upon entry, Victim had attacked Ms. Gomez.

**{5}** At trial, the State took the position that Defendant had not acted in self-defense, but instead had killed Victim willfully and deliberately by repeatedly striking him with the baseball bat. It was also the State's theory that Defendant kidnapped Victim by rolling him up in the carpet so that if Victim regained consciousness, he would not be able to move or call for help. The State argued that Defendant's efforts to mop up the blood in the living room and stash the bat behind the washing machine supported two counts of tampering with evidence. The State additionally argued that, by moving Victim to the back bedroom and rolling him up in a carpet, Defendant was trying to hide evidence of his crimes from the police, thereby *attempting* to tamper with evidence.

**{6}** The jury convicted Defendant on all counts,[1] and Defendant was sentenced to fifteen years' incarceration for second degree murder with two years of parole; eighteen years' incarceration for kidnapping followed by two years of parole; eighteen months' incarceration for attempted tampering with evidence followed by one year of parole; and three years' incarceration followed by two years of parole for each of the tampering with evidence convictions. The district court ordered Defendant to serve the sentences for murder, kidnapping, attempted tampering, and one of the tampering charges consecutively, but ordered the second tampering with evidence charge to be served concurrent with the sentence for second degree murder. We provide additional facts as needed to address Defendant's claims on appeal.

## DISCUSSION

### I. Defendant's Right to a Public Trial Was Not Violated

**{7}** Upon completion of a three-day jury trial, defense counsel learned that the courtroom had been closed to several members of the public, including, it appears, three members of Defendant's family, for a ten to fifteen minute period during closing arguments. The closure occurred, unbeknownst to the district court and the parties, when a court security officer barred entry to the would-be spectators in response to a "Do Not Enter" sign that, for reasons unknown had been affixed to the courtroom door. Defendant filed a post-verdict motion for a new trial, arguing that the closure was of constitutional dimension, and the district court held a hearing to determine the causes and circumstances of the temporary courtroom closure. The upshot of the hearing was two-fold: the district court neither ordered nor was aware of the closure, and no one could say with certainty who posted the closure sign or why. The hearing testimony showed that the bailiff, upon learning of the situation as it unfolded, immediately directed that all members of the public be permitted entry. Despite the exclusion of a few, the courtroom was otherwise full of spectators, including members of the media, who had entered before the brief and inadvertent closure. The district court denied Defendant's motion, emphasizing the limited nature—both in time and scope—of the courtroom closure.

**{8}** Defendant argues that the period of minutes during which the courtroom was closed violated his right to a public trial under the Federal and New Mexico Constitutions. We review de novo whether a defendant's constitutional rights have been violated. *State v. Turrietta*, 2013-NMSC-036, ¶ 14, 308 P.3d 964.

**{9}** The Federal Constitution provides that "[i]n all criminal prosecutions, the accused shall enjoy the right to a speedy and public trial[.]" U.S. Const. amend. VI. The New Mexico Constitution similarly provides that an accused shall have "a speedy public trial by an impartial jury of the county or district in which the offense is alleged to have been committed." N.M. Const. art. II, § 14. The values protected by the Sixth Amendment

---

[1]Defendant was charged with first degree murder, but the jury was instructed on second degree murder, voluntary manslaughter, and involuntary manslaughter as well. The jury found Defendant guilty of second degree murder.

right to a public trial are to ensure a fair trial, remind the prosecutor and judge of their responsibility to the accused and the importance of their functions, encourage witnesses to come forward, and discourage perjury. *See Waller v. Georgia*, 467 U.S. 39, 46 (1984). "The right to a public trial is not absolute and may give way in certain cases to other rights or interests, such as the defendant's right to a fair trial or the government's interest in inhibiting disclosure of sensitive information." *Turrietta*, 2013-NMSC-036, ¶ 15 (internal quotation marks and citation omitted). "A total courtroom closure is allowed when there is 'an overriding interest based on findings that closure is essential to preserve higher values and is narrowly tailored to serve that interest.' " *Id.* ¶ 17 (quoting *Waller*, 467 U.S. at 45). To determine whether there is an "overriding interest" sufficient to justify a courtroom closure, the district court must adhere to the following standard: "[1] the party seeking to close the hearing must advance an overriding interest that is likely to be prejudiced, [2] the closure must be no broader than necessary to protect that interest, [3] the district court must consider reasonable alternatives to closing the proceeding, and [4] it must make findings adequate to support the closure." *Id.* (alterations in original) (quoting *Waller*, 467 U.S. at 48).

**{10}** Defendant contends that because the courtroom closure at issue did not meet the "overriding interest" standard, it was unconstitutional. *See id.* But Defendant's application of *Turrietta* to the facts at hand is misplaced. In that case our Supreme Court applied the "overriding interest" standard in the specific context of a courtroom closure sought by the State and ordered over a defense objection. *See id.* ¶¶ 5-6. In this case, the district court had no knowledge of, much less any role in, the closure, and there was no defense objection to the closure, which came and went without notice by the district court or the parties.

**{11}** New Mexico jurisprudence has yet to address this precise situation. The State urges us to follow federal case law, which has consistently declined to find a violation of a defendant's constitutional right to a public trial where, as is the case here, the closure is fairly characterized as "trivial." We agree, persuaded as we are by the reasoning of the federal cases cited by the State.

**{12}** In *Peterson v. Williams*, 85 F.3d 39, 41-42 (2d Cir. 1996), the district court properly closed a courtroom during the testimony of an undercover officer, but inadvertently left it closed for an additional fifteen to twenty minutes during the defendant's ensuing testimony. The defendant argued that this inadvertent closure violated his right to a public trial. *Id.* at 41. The Second Circuit disagreed, holding that the closure did not violate the values protected by the right to a public trial because the closure was short and inadvertent and because the relevant portions of the defendant's testimony, which some members of the public may have been prevented from hearing, were repeated by defense counsel in summation. *Id.* at 43-44. In other words, the closure was too trivial to violate the Sixth Amendment. *Id.* at 44; *see also Carson v. Fischer*, 421 F.3d 83, 92-95 (2d Cir. 2005) (holding that the intentional exclusion of the defendant's ex-mother-in-law from the courtroom during testimony of a confidential informant was too trivial to implicate the Sixth Amendment); *United States v. Al-Smadi*, 15 F.3d 153, 154-55 (10th Cir. 1994) (holding that the defendant was not denied a

public trial where the courthouse closed at its usual time, 4:30 p.m., the trial continued for no more than twenty minutes, and only defense counsel's wife and child were prevented from entering); *Snyder v. Coiner*, 365 F. Supp. 321, 323-24 (N.D.W. Va. 1973) (mem. order) (holding that the accidental closure of the courtroom during summation did not amount to denial of a public trial where the closure was relatively short and it was unclear whether any spectators were in the courtroom during the closure), *aff'd on other grounds*, 510 F.2d 224 (4th Cir. 1975).

**{13}**   Defendant cites no authority to support the position he advances: that any wrongful courtroom closure, no matter how trivial or de minimus, violates a defendant's right to a public trial. Nor are we aware of any such authority. Indeed, as the Washington Supreme Court recently observed in analogous circumstances, "[T]here is no jurisdiction we are aware of that has adopted a rule completely rejecting the doctrine of de minimis closures." *State v. Schierman*, 415 P.3d 106, 126 (Wash. 2018).

**{14}**   We agree with the uniform line of authority holding that a courtroom closure that is determined to be trivial does not meaningfully infringe upon the values protected by the right to a public trial. *See Peterson*, 85 F.3d at 43 (considering the impact of the closure vis-à-vis the "the values furthered by the public trial guarantee"); *see also Weaver v. Massachusetts*, ___ U.S. ___, ___, 137 S. Ct. 1899, 1909 (2017) (recognizing that "not every public-trial violation results in fundamental unfairness"). Such is the circumstance in this case. First, we can only characterize what occurred in this case as a "closure" in the most technical sense of the term, considering that, as Defendant now readily acknowledges, "the courtroom was full of spectators and the media" during the isolated portion of the proceedings—a period of no more than fifteen minutes during closing arguments—around which Defendant's constitutional argument centers. It was, at most, a brief, inadvertent, partial closure, one promptly remedied by the bailiff as soon as the problem was reported. Defendant offers no explanation, and none readily comes to mind, as to how such a limited closure deprived him of a fair trial. *See United States v. Scott*, 564 F.3d 34, 38 (1st Cir. 2009) (concluding that, despite the trial court's directive barring spectators from entering or leaving the courtroom during the jury charge, no closure occurred because "the public was indeed present at the jury charge and with its presence cast the sharp light of public scrutiny on the trial proceedings, thus providing the defendant with the protections anticipated by the public trial provision of the Constitution"). Second, as was true of all the trial's participants, the judge and prosecutor were not aware of the occurrence of the courtroom closure, a circumstance which alleviates any concern that the closure somehow diminished their "sense of . . . responsibility [to the accused] and . . . the importance of their functions[.]" *Waller*, 467 U.S. at 46 (internal quotation marks and citation omitted). Lastly, the closure occurred following the evidentiary stage of the trial during closing statements, at a time when respective counsel were summarizing and commenting on the evidence presented during proceedings that undisputedly had been open to the public. As such, the *Waller* goals of encouraging witnesses to come forward and discouraging perjury are not remotely implicated by the closure here involved. We therefore hold that the brief, inadvertent closure of the courtroom during closing argument was trivial and did not violate Defendant's right to a public trial.

**II.  Defendant's Challenges to the Sufficiency of the Evidence Supporting His Convictions for Kidnapping, Tampering With Evidence and Attempted Tampering With Evidence Fail**

**{15}**   Defendant argues, in perfunctory fashion, that there was insufficient evidence to support his convictions for kidnapping, the two tampering with evidence counts, and attempted tampering with evidence. We begin by cautioning Defendant's appellate counsel that the presentation of these issues is woefully inadequate and undeveloped, spanning less than a single page for each contention and offering scant legal or factual analysis. *See* Rule 12-318(A)(4) NMRA (requiring citations to applicable New Mexico decisions); *State v. Guerra*, 2012-NMSC-014, ¶ 21, 278 P.3d 1031 (observing that the appellate courts are under no obligation to consider undeveloped or unclear arguments); *State v. Clifford*, 1994-NMSC-048, ¶ 19, 117 N.M. 508, 873 P.2d 254 (reminding counsel that the appellate courts are not required to do their research); *State v. Vigil-Giron*, 2014-NMCA-069, ¶ 60, 327 P.3d 1129 ("[A]ppellate courts will not consider an issue if no authority is cited in support of the issue and that, given no cited authority, we assume no such authority exists[.]"); *Muse v. Muse*, 2009-NMCA-003, ¶ 72, 145 N.M. 451, 200 P.3d 104 ("We will not search the record for facts, arguments, and rulings in order to support generalized arguments."). Consequently, and to the extent feasible given the cryptic nature of Defendant's arguments, we briefly address the evidence supporting Defendant's four convictions. Further, where possible, we rely on the counterarguments advanced by the State in its answer brief to better understand the vague sufficiency challenges raised by Defendant.

**{16}**   "The test for sufficiency of the evidence is whether substantial evidence of either a direct or circumstantial nature exists to support a verdict of guilty beyond a reasonable doubt with respect to every element essential to a conviction." *State v. Montoya*, 2015-NMSC-010, ¶ 52, 345 P.3d 1056 (internal quotation marks and citation omitted). The reviewing court "view[s] the evidence in the light most favorable to the guilty verdict, indulging all reasonable inferences and resolving all conflicts in the evidence in favor of the verdict." *State v. Cunningham*, 2000-NMSC-009, ¶ 26, 128 N.M. 711, 998 P.2d 176. We disregard all evidence and inferences that support a different result. *See State v. Rojo*, 1999-NMSC-001, ¶ 19, 126 N.M. 438, 971 P.2d 829.

**A.   Kidnapping**

**{17}**   As explained by the State in its response to Defendant's cursory challenge to the sufficiency of the evidence supporting his conviction for kidnapping, the State's case at trial rested on alternative theories regarding how Defendant's act of moving Victim's moribund body to the back bedroom and rolling him up in the carpet constituted kidnapping under NMSA 1978, Section 30-4-1 (2003). First, the State argued that Victim was "kidnapped" based on being "held to service," i.e., prevented from trying to assist himself or reporting the crime to police, in violation of Section 30-4-1(A)(3). *See id.* (providing that "[k]idnapping is the unlawful taking, restraining, transporting or confining of a person, by force, intimidation or deception, with intent . . . that the victim be held to service against the victim's will"); *State v. Vernon*, 1993-NMSC-070, ¶ 13, 116 N.M.

737, 867 P.2d 407 (explaining that to "hold to service" means that the victim must "be held against his or her will to perform some act, or to forego performance of some act, for the benefit of someone or something" (internal quotation marks omitted)), *superseded by statute as stated in State v. Baca*, 1995-NMSC-045, ¶ 41, 120 N.M. 383, 902 P.2d 65. Alternatively, the State argued that Defendant's conduct in moving and wrapping Victim's body was actuated by an intent to inflict death or physical injury on Victim, thus constituting kidnapping under Section 30-4-1(A)(4). *See id.* (providing that "[k]idnapping is the unlawful taking, restraining, transporting or confining of a person, by force, intimidation or deception, with intent . . . to inflict death, physical injury or a sexual offense on the victim"). Consistent with the State's alternative theories, the jury was instructed that, to convict Defendant of kidnapping it had to find that:

> 1. [D]efendant took or restrained or confined or transported [Victim] by force or intimidation;

> 2. [D]efendant intended to hold [Victim] against [Victim's] will:

> [(a)] to inflict death or physical injury on [Victim]

> OR

> 3. [(b)] for the purpose of making [V]ictim do something[,] or for the purpose of keeping [V]ictim from doing something;

> This happened in New Mexico on or about the 20th day of November, 2013.

**{18}** Thus, Defendant's vague challenge to the sufficiency of the evidence supporting his kidnapping conviction appears to boil down to a claim that "[n]o service was performed" and that Defendant "committed the murder and then moved [Victim]" in order "to hide the body from Ms. Gomez's children." Citing only to *Vernon*, 1993-NMSC-070, ¶ 13, Defendant argues that his conviction for kidnapping was unsupported by substantial evidence because his act of moving Victim to the back bedroom and rolling him up in the carpet was merely an incidental restraint to the homicide, and thus could not have satisfied the "held to service" element of kidnapping. The State responds that *Vernon* is factually distinguishable from the instant case because the act of asportation that formed the basis for the insufficiently proven kidnapping charge in *Vernon preceded* and was incidental to the ensuing homicide, *see id.* ¶ 6, whereas here, the acts giving rise to the kidnapping charge *followed* and were "separate and distinct" from Defendant's infliction of the injuries that led to Victim's death. Given the parties' substantive disagreement as to the applicability of *Vernon* to the kidnapping statute, we address the current state of the law regarding both.

**{19}** Assuming, arguendo, that the State failed to prove that Victim was "held to service" within the meaning of that term as interpreted in *Vernon*, Defendant's argument fails to appreciate that *Vernon* was superseded by the Legislature's amendment to the

kidnapping statute in 1995, which added the taking of a person "with intent to inflict death, physical injury, or a sexual offense" as an alternative means of committing kidnapping. *Compare* NMSA 1978, § 30-4-1(A)(1)-(3) (1994), *with* NMSA 1978, § 30-4-1(A)(1)-(4) (1995); *see Baca*, 1995-NMSC-045, ¶ 41 (noting that the Legislature amended the statute to include taking a person to facilitate the killing of that person after our Supreme Court decided *Vernon*). Thus, under the post-1995 and current version of the kidnapping statute, a defendant can be found guilty for taking someone against his or her will to hold that person, inter alia, "to service" *or* "to inflict death, physical injury or a sexual offense on [that person]." Section 30-4-1(A)(3), (4). Defendant's argument under *Vernon* that his "incidental movement" of Victim was not sufficient to satisfy the "held to service" element of the kidnapping statute misapprehends the separate and distinct avenues of criminal liability available to and pursued herein by the State.

**{20}** Having misunderstood the scope of the current, post-*Vernon* iteration of the kidnapping statute and its separate avenues of liability, Defendant fails to address whether sufficient evidence supported the State's alternative theory of kidnapping based on evidence that Defendant intended to inflict death or physical injury on Victim by moving him to the back room and rolling him up in the carpet. This omission is also fatal to Defendant's challenge to the sufficiency of his kidnapping conviction. *See State v. Duttle*, 2017-NMCA-001, ¶ 33, 387 P.3d 885 (explaining that a "general verdict will not be disturbed if there is substantial evidence in the record to support at least one of the theories of the crime presented to the jury"); *see also* Rule 12-318(A)(4) (providing that a finding that is not attacked "shall be deemed conclusive" and that "[a] contention that a verdict . . . or finding of fact is not supported by substantial evidence shall be deemed waived unless the argument identifies with particularity the fact or facts that are not supported by substantial evidence"). Because Defendant has failed to demonstrate any error relating to his kidnapping conviction, we affirm that conviction. *See State v. Aragon*, 1999-NMCA-060, ¶ 10, 127 N.M. 393, 981 P.2d 1211 (noting that "it is [the appellant's] burden on appeal to demonstrate any claimed error below").

## B.    Tampering With Evidence

**{21}** Defendant challenges his convictions for tampering with evidence as being unsupported by substantial evidence. "Tampering with evidence consists of destroying, changing, hiding, placing or fabricating any physical evidence with intent to prevent the apprehension, prosecution or conviction of any person or to throw suspicion of the commission of a crime upon another." NMSA 1978, § 30-22-5(A) (2003). Intent to tamper with evidence can be inferred from circumstantial evidence. *See State v. Schwartz*, 2014-NMCA-066, ¶ 36, 327 P.3d 1108 (stating that the jury could infer the defendant's intent to tamper with evidence from evidence, inter alia, that the defendant owned a blue air mattress and sheets and that the victim's body was found in a nearby alley wrapped in a blue air mattress and sheets); *see also State v. Brenn*, 2005-NMCA-121, ¶ 24, 138 N.M. 451, 121 P.3d 1050 (recognizing that "[i]ntent is usually established by circumstantial evidence[,]" which can take the form of evidence of a defendant's own actions and prior inconsistent statements). The jury is free to disregard a defendant's testimony if it finds that the defendant is not credible. *See State v. Cabezuela*, 2011-

NMSC-041, ¶ 45, 150 N.M. 654, 265 P.3d 705 (stating that jurors may "reject [the d]efendant's version of the facts" (internal quotation marks and citation omitted)).

**{22}** The two counts for which Defendant was convicted were premised on his actions of (1) mopping up Victim's blood, and (2) hiding the baseball bat behind the washing machine.[2] At trial, Defendant did not dispute that he mopped up the blood or hid the bat but testified that he did so only to prevent Ms. Gomez's children from seeing and becoming upset by the blood.

**{23}** On appeal, Defendant does nothing more than refer to this testimony to support his argument that the tampering convictions are unsupported by substantial evidence. However, not only was the jury free to reject Defendant's self-serving account of his motives, *see id.*, but it could also have inferred the requisite intent to support Defendant's tampering convictions from the evidence presented. Specifically, the jury could have found that Defendant was not credible based on the inconsistencies in his testimony regarding the frequency, sequence, and location of the blows he inflicted upon Victim during the attack, as well as the conflicts between his trial testimony and his statements to police at the scene. Further, there was sufficient evidence for the jury to infer that Defendant intended to hide evidence from the police, including the State's showing that he failed to call 911 when he initially thought he had killed Victim, that he did not attempt to remove the children from the house in lieu of disturbing the scene, and that he did not promptly allow officers into the house upon their arrival. Finally, Defendant admitted on cross-examination that his acts of hiding the bat and mopping the floor would make it harder for the police to find the incriminating evidence. We, therefore, affirm Defendant's convictions for tampering with evidence.

### C.    Attempted Tampering With Evidence

**{24}** Defendant asserts that his conviction for attempted tampering with evidence— premised upon Defendant's act of "wrapping [Victim] in a blanket and carpet and moving [Victim] from the living room to a back bedroom"—was not supported by sufficient evidence because, by moving Victim's body, he actually completed the crime of tampering with evidence. Other than the definitional language of NMSA 1978, Section 30-28-1 (1963), defining an "[a]ttempt to commit a felony" as "tending but failing to effect its commission[,]" Defendant cites no authority, identifies no particularized facts, and develops no argument as to why his conduct in moving Victim's body from one room to another should serve to immunize him from attempt liability. Notable for its absence is any attempt by Defendant to refute the State's trial position that Defendant's conduct was directed not solely at moving Victim, but rather toward an unsuccessful effort to prevent police from discovering Victim. Under these circumstances, we deem Defendant's contention on this issue waived. *See* Rule 12-318(A)(4) (providing that "[a] contention that a verdict . . . is not supported by substantial evidence shall be deemed waived unless the argument identifies with particularity the fact or facts that are not

---

2 Defendant's brief states that the State "failed to present sufficient evidence of three counts of tampering with evidence." We believe this was a clerical error because Defendant was only charged with and convicted of two counts of tampering with evidence.

supported by substantial evidence"). We reiterate that because we are under no obligation to review unclear or undeveloped arguments, and because we will not consider an issue if no authority is cited in support of the issue, we conclude that Defendant has failed to show that his conviction for attempted tampering with evidence is unsupported by substantial evidence. *See Guerra*, 2012-NMSC-014, ¶ 21 (observing that we need not consider undeveloped or unclear arguments); *Vigil-Giron*, 2014-NMCA-069, ¶ 60 (stating that when a party cites no authority in support of an argument, we may assume no such authority exists).

### III. Defendant's Convictions for Attempted Tampering With Evidence and Kidnapping Do Not Violate Double Jeopardy

**{25}** Defendant next argues that his right to be free from double jeopardy was violated by his convictions for attempted tampering with evidence and kidnapping. We review Defendant's double jeopardy claim de novo. *See State v. Andazola*, 2003-NMCA-146, ¶ 14, 134 N.M. 710, 82 P.3d 77.

**{26}** Defendant raises a double description claim, "in which a single act results in multiple charges under different criminal statutes[.]" *State v. Bernal*, 2006-NMSC-050, ¶ 7, 140 N.M. 644, 146 P.3d 289. In conducting a double description analysis, we consider the elements of the statutes using the test set forth by the United States Supreme Court in *Blockburger v. United States*, 284 U.S. 299 (1932), to determine whether each statute at issue "requires proof of a fact which the other does not." *State v. Montoya*, 2013-NMSC-020, ¶ 31, 306 P.3d 426 (internal quotation marks and citation omitted). If one statute is subsumed within the other, the statutes are the same for double jeopardy purposes and a defendant cannot be punished under both statutes. *Id.* Our Courts have modified the *Blockburger* test, noting that "a complete double jeopardy analysis may require looking beyond facial statutory language to the actual legal theory in the particular case by considering such resources as the evidence, the charging documents, and the jury instructions." *Id.* ¶ 49.

**{27}** Where neither statute subsumes the other, we presume that the Legislature intended separate punishments, but this presumption "may be overcome by other indicia of legislative intent." *State v. Silvas*, 2015-NMSC-006, ¶¶ 12-13, 343 P.3d 616 (internal quotation marks and citation omitted). In analyzing the legislative intent underlying the statutes, we must consider "the language, history, and subject of the statutes" in order to "identify the particular evil sought to be addressed by each offense." *Id.* ¶ 13 (internal quotation marks and citation omitted). "If several statutes are not only usually violated together, but also seem designed to protect the same social interest, the inference becomes strong that the function of the multiple statutes is only to allow alternative means of prosecution." *Montoya*, 2013-NMSC-020, ¶ 32 (internal quotation marks and citation omitted). Where a statute is vague and unspecific, we must look to the State's theory of the case in evaluating the legislative intent by reviewing the charging documents and the jury instructions given. *See Silvas*, 2015-NMSC-006, ¶ 14.

**{28}** Here, neither statute subsumes the other. Attempted tampering with evidence requires the accused to take a substantial step toward "destroying, changing, hiding, placing or fabricating any physical evidence with intent to prevent the apprehension, prosecution or conviction of any person or to throw suspicion of the commission of a crime upon another." Section 30-22-5(A). By contrast, kidnapping, as here relevant, requires that one take, restrain, transport or confine a person "by force, intimidation or deception," intending to hold the person to service or with the intent to injure or kill him. Section 30-4-1(A)(3), (4); *State v. Montoya*, 2011-NMCA-074, ¶ 37, 150 N.M. 415, 259 P.3d 820 (noting that the pertinent inquiry for double description purposes is the state's theory of kidnapping). Plainly, each statute requires proof of a fact (or facts) that the other does not—with tampering with evidence focusing on a defendant's intent to hide evidence to avoid prosecution, and kidnapping focusing instead on a defendant's intent in "unlawful[ly] taking, restraining, transporting or confining of a person[.]" *Compare* § 30-22-5, *with* § 30-4-1(A)(3), (4). Tampering with evidence, or an attempt to do the same, does not require that a person be held and made to do something, nor does it require the infliction of death or physical harm upon another. *See* § 30-22-5. Kidnapping does not require that evidence be hidden or altered to prevent a criminal investigation. *See* § 30-4-1(A)(3), (4). Because neither statute subsumes the other, we proceed to consider whether other indicia of legislative intent prohibit Defendant from being punished separately under each statute. *See Silvas*, 2015-NMSC-006, ¶¶ 12-13.

**{29}** The Legislature clearly intended the statutes here at issue to address distinct social harms. Tampering with evidence is designed to punish individuals who attempt to interfere with the administration of justice by hiding or changing evidence that could be used in a criminal prosecution. *See* § 30-22-5. The pertinent sections of the kidnapping statute, on the other hand, are intended to prevent individuals from harming others or depriving others of their freedom with the intent to force them to do something against their will. *See* § 30-4-1(A)(3), (4). Nor is there any basis to conclude that these two crimes are typically committed together. *Cf. State v. Almeida*, 2008-NMCA-068, ¶ 21, 144 N.M. 235, 185 P.3d 1085 (stating that "a charge for possessing a personal supply of a controlled substance will almost always carry the additional charge of possession of drug paraphernalia").

**{30}** We hold that Defendant's convictions for attempted tampering with evidence and kidnapping do not violate the prohibition against double jeopardy because neither statute is subsumed within the other, the statutes address distinct social harms, and because there is no indication that the Legislature intended only alternative punishment for conduct that violates both statutes. *See Montoya*, 2013-NMSC-020, ¶¶ 31-33 (setting forth the inquiry for double description cases).

## D. There Was No Cumulative Error

**{31}** Defendant argues that the violation of his right to a public trial and the violation of his right to be free from double jeopardy, taken together, amount to cumulative error requiring a new trial. Having concluded there was no error, we need not consider this argument.

**CONCLUSION**

**{32}** For the reasons set forth above, we affirm Defendant's convictions.

**{33}  IT IS SO ORDERED.**

**J. MILES HANISEE, Judge**

**WE CONCUR:**

**M. MONICA ZAMORA, Chief Judge**

**KRISTINA BOGARDUS, Judge**